**In re XONICS, INC., et al., Debtors.**

**COMMITTEE OF the CREDITORS OF XONICS MEDICAL SYSTEMS, INC., Plaintiff,**

**v.**

**Charles F. HAVERTY, Defendant.**

**Bankruptcy Nos. 84 B 2101 to 84 B 2108.**

**Adv. No. 86 A 152.**

United States Bankruptcy Court, N.D. Illinois, E.D.

May 12, 1989.

---

See also, 7th Cir., 813 F.2d 127.

C. Joseph Yast, Terrence P. Canade, Lord, Bissell & Brook, Chicago, Ill., for plaintiff.

Larry L. Thompson, John J. Verscaj, Laurie D. Jaffe, Bell, Boyd & Lloyd, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

THOMAS JAMES, Bankruptcy Judge.

Plaintiff, Committee of the Creditors of Xonics Medical Systems, Inc., has asked this court to reconsider its granting of the motion of defendant, Charles F. Haverty, to dismiss this adversary proceeding after the Committee had completed the presentation of its trial evidence. [As noted in the court's memorandum and order of July 31, 1987 the only creditors committee in these consolidated Xonics cases is the committee of unsecured creditors appointed on March 5, 1987, in the Xonics Medical Systems, Inc. case, file no. 84 B 2102. The caption of this adversary proceeding was amended at that time to show the Committee as plaintiff.] For the reasons stated in open court on September 29, 1988, this court found and concluded that upon the facts and the law the Committee had after completion of its presentation of evidence shown no right to relief, granted Haverty's motion and dismissed the complaint as provided by Fed.R. Civ.P. 41(b) [Bankruptcy Rule 7041]. The court will deny plaintiff's motion to reconsider.

■ It is unfortunate that the Committee has attempted to seek reconsideration of the court's ruling by intimating that the court's remarks about submission of the issues at the close of all evidence left it surprised by the court's consideration of Haverty's motion at the close of the Committee's evidence. When a defendant moves at the close of a plaintiff's presentation, it is incumbent on a court to determine whether the plaintiff has had a full and fair opportunity to present his case; if so, whether on the facts and the law plaintiff has shown a right to relief.

This court's comments as to submission of the case at the close of all evidence cannot and should not preclude Haverty

from testing the sufficiency of the Committee's evidence when it has rested. Fed.R. Civ.P. 41(b) gives every plaintiff in any adversary proceeding sufficient notice that the case may be disposed of on its merits at the close of the presentation of a plaintiff's evidence.

The court and the parties must be concerned as to the just, speedy and inexpensive determination of every adversary proceeding. Indeed, Bankruptcy Rule 1001 requires that the Bankruptcy Rules be construed to provide such determination.

Moreover, the Federal Rules of Evidence as stated in Fed.R.Evid. 102 are to be construed to secure fairness in administration and elimination of unjustifiable expense and delay. This court in its humble opinion believes that it must give the utmost care and consideration to a motion to dismiss at the close of the plaintiff's case in order to accomplish the purposes of these rules. It may not and should not cavalierly deny or decline to rule on the motion, for to do so may impose undue costs on a defendant. A plaintiff must be prepared to meet such a motion during a trial as it should be prepared to meet arguments on the admissibility of evidence. Trial preparation is required to meet the exigencies that occur at trial. To require less of plaintiffs imposes on defendants. A plaintiff may not wait until all the evidence is in and then claim that its case has been submitted. The close of plaintiff's case is the proper time to test sufficiency of plaintiff's evidence.

This court's position is strengthened by the provisions in Bankruptcy Rule 9011 that the signature of an attorney constitutes a certificate by that attorney that the adversary proceeding is well grounded in fact and is warranted by existing law or good faith argument for the extension of that law. When considering Haverty's motion to dismiss all the court required of this plaintiff was for it to come forward to show that, indeed, plaintiff's adversary proceeding was well grounded in fact and warranted by existing law. No claim of surprise is justified. The court did consider the Committee's evidence in the light most favorable to the Committee and found the evidence lacking in law.

■ The Committee claims that Haverty, the former chairman and chief executive officer of Xonics, Inc., breached his fiduciary duty to its creditors by leading Xonics into a ruinous transaction while Xonics was insolvent. Haverty's liability is to be considered under Delaware law because Xonics was a Delaware corporation. This court in ruling on the motion to dismiss found that the facts failed to show that Haverty had breached the trust imposed by Delaware law on officers and directors of an insolvent corporation or that Haverty had abused the business judgment rule in exercising his business judgment. Of course, the business judgment rule has no application as to the Committee's claim against Haverty for creditors have no standing to sue an officer or director under Delaware law unless it has been established that the corporation was insolvent. When a corporation is insolvent its officers and directors stand in a position of trust not only to the corporation and its shareholders, but also to its creditors.

■ As noted, the court must in considering a defendant's motion to dismiss at close of plaintiff's case view the evidence in the light most favorable to plaintiff. There was no issue as to Xonics's solvency. The court must and did consider Xonics insolvent. Therefore, the creditors committee did have standing to seek damages against Haverty. The question, then, is whether this court ruled properly in finding that the facts did not show that Haverty had breached his duty to creditors. Haverty and the directors became trustees for the benefit of all creditors at the moment Xonics and XMS became insolvent. This court is of the opinion that it was correct in finding that Haverty had dealt fairly and in good faith in regards to the Xonics's transaction with Elscint, Inc.

Plaintiff's evidence shows that in late 1983 when debtors Xonics, Inc. and Xonics Medical Systems, Inc. were insolvent, Haverty as an officer and director of Xonics negotiated, directed and approved the sale to Elscint of certain valuable assets of Xon-

ics and XMS. Xonics and XMS transferred certain assets to Elscint/USA for $10,000,000 and a manufacturing agreement between Xonics and Elscint, Ltd. and Elscint/USA under which Xonics would manufacture exclusively and sell to Elscint, Ltd. and Elscint/USA all the requirements of Elscint, Ltd. and Elscint/USA for x-ray products. Elscint/USA also guaranteed $5,000,000 of Xonics's obligations to First Wisconsin Financial Corporation.

After the sale of assets to Elscint, Haverty joined Elscint and became one of its directors. As part of the transaction First Wisconsin Financial released Haverty of a substantial exposure on a guaranty to First Wisconsin Financial of the obligations of Xonics to First Wisconsin Financial.

Haverty owed a fiduciary duty to protect the interests of the creditors of Xonics and XMS in all actions that he might undertake for these corporations.

Haverty is said to have breached this fiduciary duty by failing to adequately examine and investigate the Elscint transaction and the effect that it would have on Xonics, XMS and the creditors of Xonics and XMS, in securing a release of his substantial personal guaranty obligations to Xonics, and by profiting from the Elscint transaction by placing his own personal interests ahead of the interests of Xonics, XMS and their creditors.

However, Xonics's directors' action at the special meeting of the Xonics's board on December 8, 1983, in this court's opinion absolves Haverty from any claim that he has breached his trust. Directors Haverty, Kulek, Hill, Morgan, DiVall, Miller, Doede and Weisgal were present as well as David R. Shevitz, Xonics's general counsel, and Francis J. Gerlits who had been specially retained by Hill, Morgan, DiVall, Miller, Doede and Weisgal to represent them in connection with certain of the matters to come before the meeting. The minutes of this meeting (exhibit 35) state:

"The next item of business to come before the meeting was a consideration of the sale of certain assets or subsidiaries by the Company in order to meet the Company's cash needs and to satisfy the requirements of the company's bank lenders. The first matter presented to the Board by Mr. Haverty was the offer by Hewlett–Packard to acquire the Company's EkoLine subsidiary pursuant to the proposal distributed to the directors and attached [to the minutes as Exhibit A]. Mr. Haverty explained that the Hewlett–Packard offer was the best received for EkoLine, but that it was possible that other offers could be made which may be better or worse than the Hewlett–Packard offer. Mr. Haverty also advised the Board that the banks had not yet indicated to the Company how much of the anticipated proceeds of this transaction would have to be paid to the banks in order to cause them to release their liens on the transferred assets. Mr. Haverty explained to the Board that, in view of the Company's approximate $3.5 million loss in October and $2 million loss in November, coupled with the lag of orders in the marketplace in general, and the recent adverse publicity about Xonics, it is possible that if the Hewlett–Packard deal was consummated, there would not be sufficient business left in the Company to keep it viable in view of payables in excess of $16 million owed by the Company. Mr. Haverty explained that doing the Hewlett–Packard deal might give the Company some time to shop for an additional deal but that, at best, it would only be a delaying tactic. In addition, Mr. Haverty observed that if we sold Xonics Imaging, Inc., there would likewise not be much money left to run Xonics Medical Systems and the Company would then have disposed of its most glamorous products.

"Mr. Haverty explained the Elscint proposal. Elscint was originally interested in acquiring the Company in its entirety, but decided not to proceed on that basis because of the pending class action lawsuit and other uncertainties regarding the Company's new products. Elscint finally had confirmed that what they were really interested in was the XMS sales and service organization and the services of Mr. Haverty. Accordingly, the transaction was structured to sell the XMS sales and service organization to Elscint and for Mr. Haverty to resign from Xonics and to join Elscint if

that is what it would take to make the deal. In the proposed Elscint transaction, Xonics would sell its conventional X-ray product line, but would retain its factory and its manufacturing operation. It would be anticipated that XMS would continue to manufacture products for Elscint and could manufacture other products for other companies. In addition, Xonics would retain EkoLine and the ultra-sound products along with the XII technology and business, as well as Xonics Photochemical, Inc. These retained businesses could leave Xonics with a business which would generate approximately $70 million a year in sales, assuming that Elscint would buy approximately $20 million of products a year from XMS, that EkoLine would generate approximately $20 million of sales, that the digital products (which could be distributed by EkoLine or any other distributor) plus the PET Scope would generate approximately $20 million of sales and that Xonics Photochemical Inc. would generate about $10 million of sales. Mr. Haverty further explained that in the event Xonics were to sell any other divisions or subsidiaries or assets, Elscint would have a right of first refusal on such sales and if the right was not exercised, Elscint could obtain a non-exclusive license on the products which were being transferred, subject to a mutually agreeable royalty rate. Mr. Haverty acknowledged that although this right of first refusal could have a chilling effect on any potential purchaser, particularly when coupled with the non-exclusive license, it was unlikely that any of the most likely potential purchases for the remaining Xonics' properties would be substantially bothered by this aspect.

"Mr. Haverty advised the directors that in connection with his employment by Elscint, he would not have an employment contract, he would receive the same salary as he is supposed to be receiving from Xonics ($200,000 per year), and that he may receive an option to purchase 50,000 shares of Elscint's stock, which option would vest over four years, in addition to fringe benefits similar to those he now receives from Xonics. Mr. Haverty advised the Board that, in his judgment, Elscint has substantial operational problems in the United States and is looking to Mr. Haverty to lead and improve its U.S. organization.

"Mr. Haverty advised the Board that, in his view, unless the Company made some sale within the next two weeks, it would probably be pushed into either a voluntary or involuntary bankruptcy or reorganization. Mr. Haverty stated that one option was to do the Hewlett–Packard transaction and try to raise more money for the Company from venture capitalists. He stated that he had offered approximately 20% of the Company for approximately $9 million but that there was no interest in this proposal.

"Mr. Hill stated that he wished the Audit Committee had more time to look into the Company's financial situation and the possible sales, but that since it appeared that there was no time and that he had to leave, that he would give Dr. Doede the right to cast his vote for him, if that were legally permissible. At this point, Mr. Hill left the meeting.

"Mr. Haverty also advised the Board that he had received a letter from Litton Industries indicating that they might be interested in the PET Scope operation if Xonics was willing to sell it. Mr. Haverty stated that the Board now had in front of them all of the offers that he and the other Board members had been able to obtain for any of the Company's assets or subsidiaries. He stated that he had not been able to obtain any offers for Xonics Medical Systems, Inc. In view of the fact that the Company would be retaining all of the proceeds from the Elscint sale, along with all of its potentially saleable assets, Mr. Haverty stated that he recommended approval of the Elscint proposal.

"At this point, the Board carefully reviewed the Hewlett–Packard offer and reviewed the Elscint offer in great detail. After reviewing the offer, Mr. Miller stated that he would vote in favor of the Elscint transaction if the right of first refusal and the non-exclusive license under Paragraph 7(iv) were not in the deal and would vote against the Elscint transaction if the right

of first refusal and the non-exclusive license were in the deal.

"At this point, Messrs. Haverty, Kulek and Goldberg were asked to leave the meeting.

"Dr. Doede led the meeting at this point. He stated that the non-management directors (except Mr. Weisgal) had had a meeting the previous night and early that morning before the meeting and had discussed various alternatives amongst themselves. A filing under Chapter XI of the Bankruptcy Code had been explored but was rejected as an alternative at this point because the Company had no 'war chest', the sales of apparatus would probably diminish substantially in a Chapter XI and the Company might not be able to retain its key employees in the event of a Chapter XI proceeding.

"The relative merits of the Hewlett–Packard proposal and the Elscint proposal were discussed at great length by the directors. Dr. Doede stated that the only transaction he felt comfortable with from a monetary standpoint was the Elscint transaction because it would give the Company enough money to stay in operation for at least some period of time. In connection with Mr. Haverty's resignation from Xonics pursuant to the Elscint proposal, on motion duly made, seconded and unanimously carried, it was resolved that if Mr. Haverty submitted his resignation to the Company in connection with the Elscint transaction, he would be released from his indebtedness to the Company in the amount of $67,500 at that time and that if he would serve as an unpaid consultant to the Company through January 15, 1984 to provide the Company with his services during the transaction, he would be forgiven from the balance of his debt in the amount of $100,000. In adopting the foregoing conclusion, the directors noted that Mr. Haverty had not received any salary for the preceding three months and that the Board had previously adopted a resolution authorizing the forgiveness of Mr. Haverty's entire debt on January 15, 1984.

"At this point, Messrs. Haverty, Kulek and Goldberg were asked to rejoin the meeting and were joined by Michael Zavis of Katten, Muchin, Zavis, Pearl & Galler, who had been dealing with the Company's lenders in connection with the Elscint proposal and the recent amendments to the bank loan documents. Mr. Zavis explained to the directors that in his view the lending banks would not continue to finance the Company unless some sale was made by the Company very quickly.

"On motion duly made by Mr. Weisgal and seconded by Dr. Morgan, it was resolved that the Company enter into the sale of Xonics Medical Systems' sales and service organization with Elscint, Limited on substantially the terms presented to the directors at this meeting and that the proper officers of the Company execute and deliver such documents that may be appropriate to consummate such transaction. Mr. Miller voted against the resolution and the other directors present voted in favor of the resolution.

"In light of Mr. Haverty's resignation upon the closing of the Elscint transaction, the Board, upon motion duly made and seconded, unanimously elected Sidney Kulek president and chief executive officer of Xonics, Inc. effective at the closing of the Elscint transaction. In addition, the Board unanimously approved the resolution set forth on Exhibit B amending the by-laws of the Company to reflect the merging of the offices of president and chief executive officer."

The court would like at this time to comment on the Hewlett–Packard transaction.

Plaintiff has argued that the letter dated December 7, 1983 from Hewlett–Packard to Haverty (exhibit 4) is an offer from HP that would bind Xonics if signed on its behalf. This court has reviewed and considered the legal ramifications of this letter and is still of the opinion that there would be no binding agreement for sale of certain Xonics's assets to HP on Xonics's signing. At most there may be an obligation on Xonics and HP to continue the negotiations for a binding agreement in good faith. This court is reluctant to say that such an action would lie for it is quite as surprised

as others have been with the tendency of contract disputes to metastasize into torts.

A fair reading of this letter shows that HP did not wish to go ahead with the negotiations unless certain proposals to be made part of the final agreement were agreed upon by the signing of this letter. HP stated that if these proposals were met "we can proceed with the preparations of a definitive agreement...." Even in 1983, corporate management was aware of the time that its executives had to put in on negotiations as well as the costs of legal work for the preparation of a purchase agreement of another corporation's assets. Legal expenses are a standard and often an uncontrollable item in every business's budget, diverting cash resources from other areas of entrepreneurship. HP should be commended on its decision to curtail legal expenses if there were no hope of reaching a final agreement. HP exercised proper business judgment by telling Xonics that HP would not go ahead with negotiations unless it was assured that it was worth HP's while to do so.

HP would have been as shocked as was this court to have someone claim that upon Xonics's signing of this letter HP was bound to buy the Xonics's assets. Xonics's directors' decision not to go ahead with the HP transaction cannot be said to have breached their fiduciary duty to Xonics's creditors. Certainly, this was not a breach of Haverty's trust.

Haverty's participation in the alleged "sweetheart" deal that he received in the Elscint transaction did not breach his fiduciary duty to Xonics's creditors. See Matter of Specialty Products, Inc., 94 B.R. 781 (Bkrtcy.N.D.Ga.1989). Judge Drake's discussion in Specialty Products does not resolve the issues before this court for here an independent board, after full disclosure of the "insider's deal", approved the transaction. Haverty's insider deal or sweetheart deal does not under the scenario before this court constitute a breach of Haverty's duty to Xonics's creditors.

This court has spent some time emphasizing the importance of its rendering a decision on a defendant's motion to dismiss at the close of plaintiff's evidence to avoid imposing undue costs and delay on a defendant. Here, if the court were to deny Haverty's motion it would ask Haverty only to show that the action taken was justified. Haverty would have to come forward with further evidence that his actions were not a breach of the trust owed creditors. What further evidence need Haverty submit? This court suggests that there need be no further evidence for the action by the board is sufficient. The independent directors were also required to act in a fiduciary manner to Xonics's creditors. The directors did not breach this duty as is shown by their independent actions. There is no evidence that Haverty so manipulated the board that it did not exercise proper judgment.

The fact that Haverty's services were part of Xonics's transaction with Elscint does not need Haverty's further explanation. Disclosure to the directors of his reasons for leaving and their action approving his departure must suffice unless the Committee can show that the conduct of Haverty and the directors offends accepted notions of fiduciary duties. This court must be able to rely on officers' and directors' actions, even for an insolvent corporation unless those seeking damages show that such actions are venal. To require less in assessing breach of fiduciary duty on the Committee's record in this case would constrain the commercial world in developing means to aid the floundering corporation. From a review and consideration of the evidence before it this court is of the opinion that it need not require Haverty to support his decision to go to Elscint with the sale of Xonics's asset with further evidence. Haverty did not have to stay with Xonics and refuse employment with Elscint to avoid a breach of the trust owed to Xonics's creditors.

The court finds and concludes that Haverty did not breach the trust owed to Xonics's creditors and that the Committee's motion to reconsider is to be denied.

It is therefore ordered that the motion of the Committee of Creditors of Xonics Medi-

cal Systems, Inc., plaintiff, for reconsideration is denied.