**In re REGO COMPANY.**

**Civ. A. No. 11651.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Aug. 26, 1992.
Decided: Oct. 16, 1992.
Revised: Oct. 22, 1992.

---

A. Gilchrist Sparks, III, and David G. Thunhorst, of Morris, Nichols, Arsht & Tunnell, Wilmington, for petitioner.

Robert K. Payson, Michael D. Goldman, and Stephen C. Norman, of Potter Anderson & Corroon, Wilmington (Katten, Muchin, Zavis & Weitzman, Los Angeles, CA, of counsel), for Emerson Elec. Co., Claimant.

Clark W. Furlow, and Michele C. Gott, of Smith, Katzenstein & Furlow, Wilmington, Guardian Ad Litem.

Thomas J. Allingham, II, and Robert A. Glen, of Skadden, Arps, Slate, Meagher & Flom, Wilmington (Locke, Purnell, Rain & Harrell, Dallas, TX, of counsel), for Trinity Industries.

Elizabeth McGeever, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington (Foley & Lardner, Washington, DC, of counsel), for Matheson Gas Products, Inc.

James W. Semple, and Thaddeus J. Weaver, of Morris, James, Hitchens & Williams, Wilmington, for EmpireGas, Inc. of Jacksonville.

Allen M. Terrell, Jr., and David L. Zicherman, of Richards, Layton & Finger, Wilmington (Adams, Kleemeir, Hagan, Hannah & Fouts, Greensboro, NC, of counsel), for Engineered Controls Intern., Inc.

OPINION

ALLEN, Chancellor.

This is an action under recently enacted provisions of the Delaware General Corporation Law creating a procedure by which a dissolved Delaware corporation may achieve, after a judicial proceeding, court approval of a plan of security for corporate claimants. The effects of such approval include (1) the preclusion of liability on the part of the directors of the dissolved corporation to claimants of the dissolved corporation for matters arising out of the making of liquidation distributions, (2) the limitation of potential liability of stockholders to the lesser of a *pro rata* share of each claim against the corporation, or the amount distributed in dissolution, and (3) the establishment of a limitations period for actions against stockholders on claims against the corporation. *See* 8 *Del.C.* §§ 280–282 (1991).

These statutory provisions are innovative. They provide a judicial mechanism designed to afford fair treatment to foreseeable future, yet unknown claimants of a dissolved corporation, while providing corporate directors with a mechanism that will both permit distributions on corporate dissolution, and avoid risk that a future corporate claimant will, at some future time, be able to establish that such distribution was in violation of any duty owed to the corporation's creditors on dissolution.

This petition provides the first application of these novel statutory enactments. *Cf. Gans v. MDR Liquidating Corporation,* Del.Ch., C.A. 9630, 1990 WL 2851, Hartnett, V.C. (Jan. 10, 1990) (dicta). Applicant, RegO Company, a Delaware corporation, filed a certificate of dissolution with the Delaware Secretary of State on February 3, 1989. On February 28, 1991, it filed its petition in this case seeking judicial approval of the security aspects of a plan of dissolution pursuant to which RegO would transfer all of its assets—approximately $36,000,000 in receivables and intangible assets (including its tradename and rights under an insurance policy)—to a trustee, to be held and administered pursuant to a Claimants Trust principally for the benefit of its present and future creditors.

The case is before the court on exceptions to the February 14, 1992 Final Report of Ann E.C. Stilson, Esquire, who was appointed Master in Chancery *pro hac vice.* Speaking generally, the Master's Final Report recommends the approval of the plan proposed by the Company with several modifications, to which, for the most part, the Company takes no exception. Contestants at this stage include the Company; Emerson Electric Company, who in other jurisdictions is presently asserting cross-claims and rights to contribution or indemnification against the Company in pending product liability suits; and Clark W. Furlow, Esquire, who, pursuant to Section 280(c)(2), was appointed guardian ad litem in this proceeding to represent the interests of future unknown corporate claimants.[1]

For the reasons set forth below I am unable to accept the Final Report in all respects. I conclude that, as presently constituted, the security aspects of the Company's plan of final distribution are not sufficient to meet the statutory requirements. In what follows, this judgment is explained and particularized, and acceptable alternatives are described.

That explanation is involved, as the legal questions raised by this application are of some complexity. To address them requires, as a predicate, an understanding of the problem that the new statutory structure addresses (Part I–A, below); and an understanding of the new statutes' structure (Part I–B). Next the background of the dissolution insofar as it is necessary to understand the parties positions is set forth (Parts II & III) and the terms of the Claimants Trust are outlined (Part IV). The central issues are identified (Part V). Thereafter the principal exceptions of Emerson (Part VI) and of the guardian (Part VII) will be considered. Lastly, I address a subordinate issue, concerning termination

---

1. A number of other claimants participated in the proceeding before the Master but have not actively participated on this review.

of the trust. In a supplemental opinion issued today, I also address the question of the identity of the trustee and a series of administrative provisions of the proposed trust.

## I.

### A. *The Legal Problem With Which the New Statutes Deal*

The law concerning the existence and scope of director and shareholder liability for corporate obligations following the dissolution of a corporation is an evolving one of some complexity and uncertainty.[2] At an early stage of our law, that law was clear, if harsh. Dissolution of a corporation was its civil death; not only could the corporation not thereafter be sued, but pending suits against it abated.[3] Corporate dissolution thus stood as a substantial risk to corporate creditors, threatening to deprive them of a party to sue on their claims. The trust fund doctrine very early evolved, in part, to offer some protection to corporate creditors when dissolution occurred.[4] While in some of its aspects the trust fund doctrine has had a varied history,[5] its central concepts have been widely acknowledged. Those core concepts are that on dissolution corporate directors have obligations to creditors and that creditors, at least creditors of whom the corporation had reason to know, have an equitable right to follow corporate assets and to impress a constructive trust upon them in the hands of shareholders.[6]

Modernly, the problem that the trust fund doctrine addresses has been ameliorated by provisions in the corporate codes of most or all jurisdictions that continue the existence of the corporation as a jural entity for limited purposes following dissolution. Now, by statute, we have a formal winding-up period in which claims can be asserted, settled or adjudicated. *See, e.g.,* 8 *Del.C.* § 278 (1991). Moreover, under modern statutes, any suit against the corporation, which was filed before dissolution or during the three year statutory wind-up period, does not abate, even on the expiration of the wind-up period.[7]

---

2. *See generally* Harry Henn & John R. Alexander, *Effects of Corporate Dissolution on Product Liability Claims,* 56 Cornell L.Rev. 865 (1971); Michael Green, *Successor Liability,* 72 Cornell L.Rev. 17 (1986); Mark R. Sarlitto, *Recognizing Product Liability Claims at Dissolution,* 87 Colum.L.Rev. 1048 (1987); Mark Roe, *Mergers, Acquisitions and Tort: A Comment on the Problem of Successor Corporate Liability,* 70 Va.L.Rev. 1559, 1564 (1984).

3. *See In re Citadel Industries, Inc.,* Del.Ch., 423 A.2d 500, 503 (1980); *Johnson v. Helicopter & Airplane Services Corp.,* 404 F.Supp. 726, 730 (D.Md.1975); *Stone v. Gibson Refrigerator Sales Corp.,* 366 F.Supp. 733, 734 (E.D.Pa.1973) (in absence of contrary statutory provision, dissolution terminates all rights against a corporation); *Crossman v. Vivienda Water Co.,* 150 Cal. 575, 89 P. 335 (1907); *Canadian Ace Brewing Co. v. Anheuser-Busch, Inc.,* 448 F.Supp. 769, 771 (N.D.Ill.1978); *Oklahoma Natural Gas Co. v. Oklahoma,* 273 U.S. 257, 259, 47 S.Ct. 391, 392, 71 L.Ed. 634 (1927).

4. The doctrine which is employed in insolvency settings as well as in formal dissolution, traces its roots to Justice Story's opinions in *Wood v. Drummer,* 3 Mason C.C.Rpts. 308, Fed.Cas. No. 17,944 (1824) and *Mumma v. The Potomac Company,* 33 U.S. (8 Pet.) 281, 8 L.Ed. 945 (1834).

5. *Fogg v. Blair,* 133 U.S. 534, 10 S.Ct. 338, 33 L.Ed. 721 (1890) (rejecting creditor's attempt to use trust fund theory to defeat priority of other creditors); *Central Hanover Bank & Trust Co. v. United Traction Co.,* 95 F.2d 50, 55 (2d Cir.1938) ("in no real sense are the assets of an insolvent debtor a trust fund for creditors"); *Patek v. California Cotton Mills,* 4 Cal.App.2d 12, 40 P.2d 927, 930 (1935). *See generally* 15A Fletcher's Cyc. Corp. §§ 7384–85 (Perm Ed.1990).

6. *E.g., Koch v. United States,* 138 F.2d 850, 852 (10th Cir.1943); *Trubowitch v. Riverbank Canning Co.,* 30 Cal.2d 335, 182 P.2d 182 (1947); *Snyder v. Nathan,* 353 F.2d 3 (7th Cir.1965). *Cf. Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808, 813 (1944) (involving an insolvent but not a dissolved corporation); *Geyer v. Ingersoll Publications Company,* Del.Ch., 621 A.2d 784 (1992).

7. Section 278 of the Delaware General Corporation Law provides in part:

    With respect to any action, suit or proceeding begun by or against the corporation either prior to or within 3 years after the date of its expiration or dissolution the action shall not abate by reason of the dissolution of the corporation; the corporation shall, solely for the purpose of such action, suit or proceeding, be continued as a body corporate beyond the 3–year period and until any judgments, orders or decrees therein shall be fully executed, without the necessity for any special direction to that effect by the Court of Chancery.

This modern scheme still leaves open the question, what, if any, rights are afforded to persons who have no claim against a corporation at the time of its dissolution, or during the statutory wind-up period, but who do thereafter acquire such a claim. Such a person might, for example, be a tort claimant who is injured by an arguably defective product some time after, perhaps years after, the corporation has been dissolved, and its affairs finally wound-up. It would seem apparent that such a person could not sue the dissolved corporation itself. Section 278 continues the corporation's existence beyond the statutory three year winding-up period "solely" for the purpose of concluding pending litigation. *In re Citadel Industries, Inc.,* Del.Ch., 423 A.2d 500 (1980).[8] But has such a person a cognizable claim against others—against directors or shareholders most notably?

This I take to be an unclear and a troubling question. A number of cases in other jurisdictions have held that directors or shareholders of a dissolved corporation have no personal liability for a corporate obligation that did not exist at the termination of the corporation's winding-up period. In both *Blankenship v. Demmler Mfg. Co.,* Ill.App., 89 Ill.App.3d 569, 44 Ill.Dec. 787, 789–90, 411 N.E.2d 1153, 1155–56 (1980) and *Pacific Scene, Inc. v. Penasquitos, Inc.,* Cal.Supr., 46 Cal.3d 407, 250 Cal. Rptr. 651, 758 P.2d 1182 (1988) courts rejected the contention that stockholders who received corporate distributions on dissolution were liable in equity for a claim that arose after the winding-up period had expired. *Accord Levin Metals v. Parr–Richmond Terminal Co.,* 631 F.Supp. 303 (N.D.Cal.1986).

On the other hand in *Green v. Oilwell,* Okla.Supr. 767 P.2d 1348 (1989) the Oklahoma Supreme Court, without focusing finely upon whether or not the winding-up period was completed, concluded that a shareholder could be held liable on an alleged tort claim that arose after the dissolution of the firm. *See also Chadwick v. Air Reduction Co.,* 239 F.Supp. 247 (N.D.Ohio 1965) (accord); *Gonzalez v. Progressive Tool and Dye Co.,* 455 F.Supp. 363 (E.D.N.Y.1978) (it is "an open question" under Massachusetts law whether trust fund theory is available to hold stockholders liable on corporate claim that arose after winding-up period had concluded).

In this state of affairs, the question of a dissolving corporation's duty, if any, to potential future claimants is problematic in at least two ways. First, the problem of compensation to persons injured by defective products or by undiscovered and actionable environmental injury, caused by dissolved corporations, is of obvious social concern. If, in the context of a corporate dissolution, the corporation law does not treat these possible contingencies responsibly, it can be expected that other legal doctrines, such as successor liability doctrines, will be stretched and shaped to address them. A default in corporation law may mean that the market for the sale of corporate assets as part of a dissolution will be chilled by the prospect of buyers being forced involuntarily to assume unknown future liabilities.[9] This is a practical problem that the law governing the creation and dissolution of corporate entities might well address. Secondly, the few adjudicated cases that hold that the trust fund doctrine is inapplicable to claims arising after the expiration of the wind-up period, may seem to corporate directors to give insufficient comfort to permit them safely to make a final distribution, if they have reason to know that future claims are quite likely to arise.

The new Delaware procedure codified at Sections 280–282 of the Delaware Corporate Law addresses both of these concerns. It structures a mechanism (alternative

---

**8.** In *Citadel* the court refused to grant an application, made after the three year winding-up period had expired, to "continue" a dissolved corporation's existence to permit the institution of litigation against it.

**9.** *Cf. United States v. Distler,* 741 F.Supp. 637, 643 (W.D.Ky.1990) (successor liability on CERC-LA claim against dissolved corporation); *Traverse Bay Area Intermediate School Dist. v. Hitco, Inc.,* 762 F.Supp. 1298, 1301 n. 2 (W.D.Mich. 1991). *See generally* Michael Green, *Successors and CERCLA: The Imperfect Analogy to Products Liability and an Alternative Proposal,* 86 Nw.U.L.Rev. —— (forthcoming 1992).

mechanisms actually) which under certain circumstances, for the first time recognizes rights in unknown future corporate claimants and provides a level of assurance to such persons that, as part of the corporate dissolution process, reasonable provision will be made for their future claims. Equally important, the new procedure offers to directors and shareholders (and perhaps transferees) assurance that, if the Court of Chancery approves security provisions for corporate claimants, then they will be protected from potential future claims arising from the decision to distribute the corporation's assets on dissolution.

The statutory mechanism that accomplishes this is not simple. I turn next to a summary description of it.

### B. *The Statutory Scheme For Voluntary Dissolution*

One can best understand this statutory scheme by focusing first upon Section 281(b), which despite its location, is the base-line provision. Section 281(b) is a default provision that governs every corporation in dissolution that does not elect to pursue the elective procedure set forth in Sections 280 and 281(a).

Section 281(b) imposes upon the dissolved corporation the obligation:

> to pay or make reasonable provision to pay all claims and obligations including all contingent, conditional or unmatured *contractual* claims known to the corporation ... (emphasis added)

In going so far the statute appears merely to codify long settled law. Section 281(b) however, goes on to require the corporation to:

> make such provision *as will be reasonably likely to be sufficient* to provide compensation for claims that have not been made known, or *that have not arisen, but that, based on facts known to the corporation ... are likely to arise* or to become known ... prior to the expiration of an applicable statute of limitation. (emphasis added)

The claims covered by this requirement, notably, are not limited to contractual claims but include all future claims that "are likely to arise ... etc."

Subsection 281(c) provides that directors of the corporation "shall not be personally liable to the claimants of the dissolved corporation" [presumably under the common law trust fund doctrine] if the corporation has "complied with subsections (a) or (b) of this section." But compliance with subsection (b)'s standard, "reasonably likely to be sufficient" will, in principle at least, always be litigable. Thus, reliance upon the mechanism of Section 281(b) may present a risky situation for corporate directors regardless of their good faith and due care.

It is difficult to see the utility in preserving this risk. In fact, the more elaborate part of the new statutory scheme is devoted to the creation of an elective dissolution procedure, referred to in subsection (a) of Section 281, which, if successfully completed, can eliminate this risk. That elective procedure involves a current judicial proceeding to determine "the amount and form of security which will be reasonably likely to be sufficient to provide compensation for claims that have not been made known ... or that have not arisen ...". Section 280(c)(2). Following this procedure allows corporate directors to assure themselves that they have satisfied the corporation's obligations to future claimants and that they will qualify for the protections afforded by Section 281(c).

This elective alternative is set forth in Sections 280 and 281(a). In barest outline it calls for notice for the presentation of claims to the dissolved corporation;[10] the rejection of, or the offering of security with respect to any claims presented;[11] and the furnishing of notice of rights to petition for the appointment of a receiver.[12] In its most innovative aspect, the new statute contemplates a determination by the Court of Chancery (1) of the amount and form of security that "will be sufficient" with respect to any contract claim that is

---

**10.** Section 280(a)(1) and (b).

**11.** Section 280(a)(2) and (b)(2).

**12.** Section 280(a)(2).

contingent, conditional or unmatured (excepting claims on implied warranties),[13] and (2) of the amount and type of security "which will be reasonably likely to be sufficient to provide compensation" for all other [*i.e.,* non-contractual] future claims "that have not arisen but that based on facts known ... are likely to arise ...".[14]

Section 281(a) provides for the distribution of assets on dissolution where a corporation has followed the elective procedure:

(a) A dissolved corporation or successor entity which has followed the procedures described in § 280 of this title (1) shall pay the claims made and not rejected in accordance with § 280(a) of this title, (2) shall post the security offered and not rejected pursuant to § 280(b)(2) of this title, (3) shall post any security ordered by the Court of Chancery in any proceeding under § 280(c) of this title, and (4) shall pay or make provision for all other claims that are mature, known and uncontested or that have been finally determined to be owing by the corporation or such successor entity.

This language is followed by a requirement that:

Such claims or obligations shall be paid in full and any such provision for payment shall be made in full if there are sufficient funds. If there are insufficient funds, such claims and obligations shall be paid or provided for according to their priority, and, among claims of equal priority, ratably to the extent of funds legally available therefor.

Finally, Section 282 limits the future obligation of any stockholder of a dissolved corporation, in the aggregate, to amounts received in dissolution (subsection (c)) and, when the corporation has complied with § 281(a) or (b), to a *pro rata* share of corporate liability or the amount distributed, whichever is less (subsection (a)).

\* \* \*

RegO elected to follow the new elective provisions of Sections 280 and 281(a). I turn now to a brief description of the factual background against which that decision was made.

## II.

### *The Factual Background of this Dissolution*

RegO was incorporated in Delaware in 1976, as an indirect wholly owned subsidiary of the Marmon Corporation. RegO engaged in the business of manufacturing and marketing valves and other components for systems using liquified petroleum, anhydrous ammonia and other compressed gases.

Due to its explosive nature, systems transporting or using L.P. gas are involved from time to time in accidents resulting in property damage and/or personal injury. Victims of these incidents, of course, often bring suit against all parties associated with the LP system involved in the accident. As a result, RegO, as a component parts manufacturer, has often been required to appear as a defendant in such product liability actions.

Until 1987, RegO was insured against loss due to products liability under an umbrella policy negotiated by Marmon. The premiums for this coverage were based primarily upon the claims experience of each Marmon company in relation to the total claims experience of the Marmon group. In the mid–1980s RegO was subject to judgments of millions of dollars and, as a result, its insurance expense increased dramatically. Due in significant part to these spiralling costs, RegO terminated its participation in the Marmon liability insurance policy and became self-insured effective January 1987.

The Company continued to experience large judgments in product liability suits, some of which involved products that had been in service for 30 years. This continuing liability pattern led to a decision by Marmon in August or September of 1988 to reorganize RegO's business in order to disassociate the manufacturing capability that

---

**13.** Section 280(c)(1).

**14.** Section 280(c)(2).

it owned from the claims legacy associated with it.

In connection with this decision, Marmon retained Duff & Phelps Financial Consulting Co. ("Duff & Phelps") to assess the value of RegO and retained the Wyatt Company ("Wyatt") to render an actuarial analysis for RegO's potential liability risk for LP products then in the market. On November 1, 1988, Wyatt reported to Marmon an estimated present value, as of January 1989, of predictable product liability claims against the company. Based on the methodology, including interest rate assumptions, employed, Wyatt's final report opined that the present value of product liability claims on already manufactured products, as of November 1988, would fall between $102,697,000 million and $115,919,-000 million. (See Px 331 at 82083). This report anticipated claims occurring until the year 2027. On October 24, 1988 Duff & Phelps reported its valuation of the RegO business, if all product liabilities were ignored, at $53,000,000 to $60,000,000 and at $24,000,000 to $27,000,000 if only product liability for products manufactured prior to the date of the Report were ignored.

On January 31, 1989, pursuant to an Asset Purchase Agreement, RegO sold substantially all of its operating assets, not including the RegO trademark, to Engineered Controls International, Inc., ("ECII"), a Delaware corporation.[15] ECII paid to RegO approximately $23,000,000, comprised of $18,405,000 in cash and the assumption by ECII of approximately $4,658,000 of RegO liabilities to trade creditors. Simultaneously with the asset sale, RegO and ECII entered into a Trademark License Agreement ("License Agreement") under which ECII is entitled to use the RegO trademark in return for annual royalty fees which in 1990 aggregated approximately $1,200,000. Under neither the As-

set Purchase Agreement nor the License Agreement, did ECII assume any liabilities of RegO for products manufactured prior to the asset transfer. Instead, RegO agreed to indemnify ECII for any losses it suffered arising from RegO equipment manufactured prior to the sale.

Three days after the asset sale, RegO filed a Certificate of Dissolution with the Delaware Secretary of State. It is asserted by certain of the respondents that "concurrently with RegO's decision to dissolve, it declared a $38,402,725.15 dividend by a post-dated corporate resolution." (Exceptions of Emerson Electric Company at 9).[16]

RegO's directors elected to make distributions on dissolution pursuant to the elective procedure of Section 280(a). Consequently, immediately following its dissolution, RegO mailed notice of this proceeding to all persons and entities known to have a claim or potential action against the Company and published notice of its dissolution in newspapers of appropriate local and national circulation.

As a result of its notice, RegO received widespread response by potential claimants who sought security from the Company for their anticipated claims. These claims fell into three categories. The first category represented claims from general creditors of RegO which, with the exception of those trade liabilities assumed by ECII according to the Asset Purchase Agreement, have been paid by the Company in the ordinary course of winding-up its affairs. The two remaining categories consist of notices of pending suits against the Company involving product liability claims and future claims of the same type that might be brought in the future against RegO. The Company has rejected all claims for security included in the latter two categories.

---

**15.** The Final Report states that the "discovery process yielded the following information. RegO, which is wholly-owned by Marmon, is ultimately controlled and largely owned by the Pritzker family who own 100% of Marmon. ECII is owned and operated for the benefit of the Pritzker grandchildren through stock owner-

ship in twelve separate Pritzker trusts." Final Report at 5 n. 5.

**16.** The Master made no finding with respect to this asserted fact. In light of the resolution reached it is unnecessary to do so in this proceeding.

## III.

### RegO's Financial Ability to Provide Security for Statutory Future Claimants

Before turning to a description of the security arrangement that RegO proposes, it may be well to focus upon the critical fact, as I see it, that RegO's present assets will most probably be inadequate to compensate all of the present and future claimants that it has reason to expect will eventually arise.[17] Actuarial studies submitted by both RegO and the guardian conclude that the present value of probable future liabilities of the trust arising from continued product liability claims far exceed the present value of the assets of the Company. RegO's actuarial expert, The Wyatt Company, estimated in 1988 that, as of January 1, 1989, the outstanding and future claims against RegO had, based on a number of reasonable assumptions, a future liability value of between $564,376,000 million and $656,803,000 million. Discounted to present value at reasonable discounts as of 1988, these foreseeable future liabilities fall between a range of $102,697,000 to $115,919,000 in present value as of November 1988. (Wyatt Report, Section II).

The Guardian's expert, Millman & Robertson, Inc. estimated in 1991 that as of February 1, 1992, (in a rather different interest rate environment) unpaid present and future claims against RegO had a present discounted value of $57,633,000. (Millman Report at 2). The Master's Report notes that, assuming RegO's projections are correct, if all claims were paid in full as they matured, the trust's assets would be exhausted by 1996, while the adoption of a $500,000 interim limit, described below, would extend the life of the trust until the year 2000 approximately. (Final Report at 43 n. 48). Claims are expected, however, to continue to arise for another 20–30 years.

(Millman Report Exh. 11); (Wyatt Report Exh. 11).

Once one focuses upon the fact that RegO's present assets are unlikely to be adequate to compensate all future claimants that it can presently reasonably anticipate over an indefinite time,[18] and upon the fact that all of its present assets are proposed to be dedicated to providing security to its claimants, the principal issues that are raised by this application necessarily emerge. They will involve the relative rights of various RegO claimants, present and future. In addition, in whatever way those relative rights are seen, where the total fund appears inadequate to compensate all qualifying future claims, the innovative aspects of Sections 280–81 [19] require that a mechanism be utilized to assure that some part of the fund remains for the more distant foreseeable claimants. RegO proposes an interim payment mechanism that would, initially at least, cap certain payments at a preset amount. Then upon termination of the trust, when one is in a position to know what all the claims come to, creditors who have been limited by the cap will qualify for further distributions.

This and other aspects of the proposed Claimants Trust are described in the next section of this opinion.

## IV.

### The Proposed Plan of Security For Claims

RegO proposes a plan for the payment and the security of its known and future unknown creditors including the establishment of a Claimants Trust and the transfer to the trust of all of RegO's assets.

The central fact of the Claimants Trust is that it will hold all of the present assets of RegO for distribution to claimants pursuant to its terms, with RegO shareholders receiving distributions only if unexpended funds remain at the termination of the

---

**17.** I put aside whatever limitation on future liability may be afforded to RegO by statutory limitation provisions incorporated into Section 280, as it cannot now be reasonably estimated what, if any, relief that might ultimately provide. *See* note 27, *infra.*

**18.** *See* once more note 27, *infra.*

**19.** That is the consideration the statutes accords to unknown future claims including its definition of "priority". 8 *Del.C.* § 281(e) (1991).

trust. The trust will be under the control of a single trustee who will conduct its affairs, which will primarily involve the supervision of the litigation and settlement of claims brought against RegO or the trust, as well as the investment and preservation of the trust's assets.[20]

The Trust Agreement divides the claims which may be paid by the trust into six categories of "obligations":

(1) Administrative Obligations; *i.e.*, all the costs and expenses incurred in the administration of the trust and in the litigation of claims brought against, or on the behalf of, the trust.

(2) Contractual Obligations; *i.e.*, claims determined to be properly payable pursuant to (a) the Asset Purchase Agreement between RegO and ECII or (b) the indemnification provisions of the Trust Agreement.[21]

(3) Product Obligations; *i.e.*, all valid claims arising from settlements or judgments establishing claims for personal injury and property damage caused by products manufactured by the Company, including related claims for indemnification or contribution.

(4) Pre–Existing Obligations; *i.e.*, all claims for amounts incurred prior to the effective date of the trust in connection with winding-up the affairs of the Company and Contractual, Product, and Non–Compensatory Damage Obligations existing but unpaid as of the effective date of the trust.

(5) Non–Product Obligations; *i.e.*, those obligations arising from claims other than Product Claims, which were asserted in lawsuits prior to the Effective Date of the trust and not settled or reduced to judgment until after the settlement date.

(6) Non–Compensatory Damage Obligations; *i.e.*, those obligations arising from claims for punitive, exemplary or other non-compensatory damages, which are claimed in connection with a product claim.

The Trust Agreement provides for the payment of these obligations in one of three ways: (1) payment in full upon maturity; (2) payment in full subject to a $500,-000 cap; or (3) payment only after all other obligations have been paid in full.

The Trust Agreement requires the trustee to pay Administrative Obligations,[22] *Pre–Existing Obligations* and Contractual Obligations (other than those for indemnification,[23]) *in full, as they mature.* But the trustee is directed to pay Product Obligations, Non–Product Obligations and Non–Compensatory Damage Obligations that are settled or reduced to judgment *after the effective date of the trust, in full, but subject to an interim limit*[24] of $500,000 occurrence.[25] That is, payment will be limited to $500,000 unless and until the trust terminates with unpaid funds, at which time amounts in excess of the interim cap may be paid. These Obligations will be paid for a proven occurrence in the order in which they arise.[26]

---

**20.** The assets of the trust will primarily consist of cash and investment grade securities as well as the RegO Trademark.

**21.** The indemnification provisions provide that the Trust shall indemnify the Trustee as well as the officers and directors of the Company for any claims brought against them in connection with their performance of their duties. *See* pp. 110–11, *infra.*

**22.** Administrative Obligations are granted priority over all other Obligations of the Trust.

**23.** ECII claims for indemnification under the Asset Purchase Agreement for Products and Non–Compensatory Damages Claims are subject to the $500,000 limit per occurrence.

**24.** This Interim Limit may be raised or lowered by the Court, at the request of the Trustee.

**25.** Any Product Obligation covered by insurance will be paid up to the amount of the available coverage. If a Product Obligation is only partially remitted by insurance, the Trust will pay the difference, subject to the Interim Limit. The Trustee may seek a modification to the Interim Limit by the Court at any time. The Trust Agreement also requires the Trustee to conduct a review and make a recommendation to the Court at the end of five years of the Trust regarding the appropriateness of the Interim Limit or whether an adjustment should be made.

**26.** To the extent two or more Obligations relating to a single occurrence arise simultaneously and full payment would exceed the Interim Limit, payments will be made ratably.

The Trust Agreement provides the following procedures with respect to the termination of the trust. After five years of operation, the trustee is to recommend to the Court whether a deadline for the assertion of all Product and Non–Compensatory Damage Claims (the "Claims Assertion Date") should be set. If the Court establishes a Claims Assertion Date, the trust will thereafter not be authorized to pay any Product or Non–Compensatory Damage claim asserted against the trust after that date. The trust is to terminate automatically on the date (the "Termination Date") ninety days after the first to occur of the following two events: (a) all Product, Non–Compensatory Damage and Non–Product Claims asserted against the Company or trust have been settled or reduced to final judgment and paid as provided in the Trust Agreement and the Claims Assertion Date has passed; or (b) the trustee has consented to, and the Court has approved, the termination of the trust.

Upon the termination of the trust, any remaining monies are to be distributed: (1) ratably for remaining Administrative Obligations; (2) to the extent funds remain, ratably to the holders of Contractual Obligations, Non–Product Obligations and Product Obligations who did not previously receive payment in full; (3) to the extent funds remain, ratably to all holders of Non–Compensatory Damage Obligations who did not receive full compensation; and (4) to the extent funds remain, to the stockholder of the Company as of the date of the establishment of the trust.

## V.

The central issue presented by this proceeding arises under Section 280(c). It is whether the Claimants Trust provides security that will be sufficient for the claims of present claimants, and will be reasonably likely to be sufficient for claims that have not been made known or that have not yet arisen, but that based on facts known to RegO are likely to arise or become known, prior to the expiration of applicable statutes of limitation.[27]

In addressing this question one must first ask the factual question whether the assets held by RegO are likely to offer security that will be adequate to reasonably assure the payment of all foreseeable future claims. As noted above, I conclude that they are not. *See* pp. 14–15. Next one must ask whether that fact disables RegO from proceeding to wind-up its affairs pursuant to Sections 280 and 281(a). I conclude that in the situation in which a dissolved corporation is dedicating all of its assets to the security arrangement offered under Section 280(c), that the inadequacy of those assets to offer full security ought not to deprive the directors of the corporation from proceeding under Section 280 and Section 281(a). *See* pp. 28–31. That is sufficiency of the security agreement may be achieved in spite of the inability to assure or secure future compensation in full to all foreseeable future claimants. Where the dissolved corporate assets are in total inadequate to secure full compensation to all foreseeable future claimants, the sufficiency of the security arrangement will inescapably involve questions of the fairness of the proposed security among various claimants or classes of claimants. In making those judgments, the Court may be guided by the policies reflected in the stat-

---

**27.** Where as here the corporation has reason to know that claims will arise but cannot know the jurisdictions in which such claims may arise and thus cannot know what statute of limitations will apply to the claims or when, under applicable law that statute may be tolled, the limitation provision of Section 280(c), in effect, provides no limitation for planning (Section 280(c)) purposes. *See* J.D. Lee & Barry A. Lindahl, 2 Mod.Tort Law § 27.96 (rev. ed. 1989) ("The general rule is that when [a products liability] action is based on negligence or strict liability in tort, the date of accrual is the time of injury."); *Arrowood v. General Motors Corp.,* 539 F.2d 1321, 1325 4th Cir. (1976) (describing the rule fixing the time of the accrual of a tort action for product defects by the date of purchase, as "outdated and generally repudiated"); Annotation, Statute of Limitations: When Cause of Action Arises on Action Against Manufacturer or Seller of Product Causing Injury or Death. 4 A.L.R.3rd 821 (1965 & Supp.1992). *Compare* Model Business Corporation Act § 14.07 (3rd Ed.1984) (statute itself fixes a single, five year limitation period).

utes as a whole and especially by the innovative aspects of Section 281(a) and (b).

Thus, the more difficult questions presented by the Claimants Trust are whether its terms, especially the preference that it accords to present claimants over unknown or future claimants, is appropriate. At pp. 106–08 below I conclude that, in light of the legislative intent reflected in Section 281(b), and less vividly but no less recognizably in Section 281(a), this preference is not justified in this factual context. This conclusion has implications for several important aspects of the Claimants Trust.

## VI.

### *The Principal Exceptions of Respondent Emerson Electric*

■ Emerson is a co-defendant with RegO in pending product liability suits and reasonably expects to be a defendant in future product liability suits involving equipment that includes RegO manufactured devices. It has made, and expects in the future to make, additional claims against RegO that if it suffers liability, then RegO is liable over to it for contribution or indemnification. Its primary objection to the plan of dissolution, and the adequacy of the security the trust offers to it for its future claims, is that the Claimants Trust is inadequately funded. It asserts that the RegO dissolution and this proceeding are a transparent effort by those who control and own RegO to deprive foreseeable future creditors of the company of the ability to hold RegO answerable for its [future] liabilities.

This scheme, it says, entails wrongs; specifically it entails the alleged fraudulent conveyance by RegO of substantial assets out of the corporation: RegO's alleged dividend of some $38 million shortly before filing its certificate of dissolution, and the sale of the Company's assets, allegedly for less than their true value. It is contended that, in fact, all of the corporations' assets at dissolution cannot provide adequate security under Section 280(c). Rather, to provide adequate security it would be necessary for RegO to recover amounts of which it was wrongfully deprived, or for the recipients of those payments or assets to bind themselves to the trust to make such payments. Since this cannot be coercively accomplished in this proceeding, Emerson asks that the court decline to approve the proposed plan under Section 280(c)(1) and (2).

The Master acknowledged the apparently litigable nature of Emerson's position in two ways. First, she recommended that language suggested by RegO in its proposed final order that would have purported to preclude the future appointment of a receiver for RegO under Section 279 of the General Corporation Law [28] be deleted from any order fixing or approving adequate security. With this recommendation, I concur. Secondly, she proposed that the order to be entered include the following language:

> [n]othing contained in this Order is intended to alter existing equitable rights of legitimate claimants to pursue appropriate relief against RegO, its directors, stockholders or their transferees from any claim for fraudulent or wrongful transfer of RegO's assets. Report at 58–59.

---

**28.** Section 279. Trustees or receivers for dissolved corporations; appointment powers; duties

When any corporation organized under this chapter shall be dissolved in any manner whatever the Court of Chancery, on application of any creditor, stockholder or director of the corporation, or any other person who shows good cause therefore, at any time, may either appoint one or more of the directors of the corporation to be trustees, or appoint one or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid, and to appoint an agent or agents under them, and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation. The powers of the trustees or receivers may be continued as long as the Court of Chancery shall think necessary for the purposes aforesaid.

This recommendation is made with knowledge of the fact that Emerson has initiated suit against RegO and others in the United States District Court for the Northern District of Illinois, alleging that the transactions that it now points to were fraudulent conveyances.

The parties disagree about the appropriateness of this particular language, but they agree that this proceeding is not intended to interfere with the adjudication of the fraudulent conveyance litigation. In my opinion, it would not in any event do so. The various limitations on stockholder liability reflected in Section 282 are limitations on liability that might arise under the trust fund doctrine. Where they apply, these provisions provide that shareholders will not have derivative liability for "any claim against the corporation." In my opinion a claim of fraudulent conveyance is not "a claim against the corporation" within the meaning of Section 282. It entails a claim that the corporate entity itself has been misused; that its assets have been conveyed for less than fair value for no proper business purpose. A claim to reverse such a conveyance is obviously not a claim against the corporation in the same sense, for example, that an action by a corporate creditor against her debtor to collect the debt is a "claim against the corporation." Thus, I conclude that, Section 282 is not intended to limit the ability of a court to recover for the benefit of creditors or for a receiver appointed under Section 279 (or in this instance for the Claimants Trust), funds fraudulently conveyed to a corporation's stockholders prior to dissolution, the transfer of which left the corporation insolvent.[29]

Thus, in approaching the issues presented by this application I put to one side the economically important question that these pre-dissolution payments may raise, and assume, but do not decide, that the assets held by RegO at the time of its dissolution, and subject to the proposed trust, comprise all of the property of the corporation to which its present and future claimants have an entitlement to look for satisfaction of their rights.

\* \* \*

■ This assumption still leaves open the question whether those assets are sufficient to support the security arrangement called for by Section 280(c). It is arguable that the benefits afforded by compliance with the elective procedure of Section 280 are only available where it is possible to offer a certain level of security to both present known claimants (*i.e.*, security that which "will be sufficient," § 280(c)(1)) and unknown or future claimants future (*i.e.*, that "which will be reasonably likely to be sufficient"). Arguably if the circumstances do not permit *that* level of security, then the corporation is required to dissolve under the more risky default provisions of Section 281(b). All exceptors urge that the level of assurance mandated by Section 280(c) cannot be supplied here.

The alternative approach, urged by RegO, holds that where *all* of the corporation's assets are offered as security, the issue of sufficiency of the security does not arise, since the company's creditors will be entirely as secure upon dissolution as they were before dissolution. On this alternative reading of Section 280(c), where all of the dissolving corporation's assets will be dedicated to providing security, issues of the structure of the security arrangement (*i.e.*, the relative treatment of different classes of claimants) will, of course exist, but the issue of sufficiency of the security will not.

This latter view is the correct one in my opinion. At least in the special case in which all of the corporation's assets are dedicated to affording security, the sufficiency of the security must be deemed established insofar as the availability of Section 281(a) procedure is concerned. To con-

---

**29.** I do agree with RegO that it is inappropriate to attempt in a final order to preserve some right to sue RegO itself that extends beyond the scope of Section 278 as the Master's suggested language would appear to do. Section 278, however, should have no impact on the ability of a creditor or a receiver to maintain, or indeed to commence, a fraudulent conveyance action against the recipient of corporate assets. Nor would it prevent the appointment of a receiver to recover them.

clude otherwise would serve no valid interest of claimants (since they, as a class, are to be the beneficiaries of all of the corporation's assets in all events) and would deprive corporate directors of such benefits as they may draw from judicial approval of the plan of security. That benefit may be real where, as here, some future claimants may (under the plan) possibly collect a smaller proportion of their claim than others. Being forced to liquidate under Section 281(b) would leave open for possible future litigation the question whether the plan was "reasonably likely to be sufficient" to compensate future claims and the consequences of any determination that it was not. The 1987 and 1990 legislation that enacted Sections 280–82 was designed, at least in part, to provide a mechanism with which such uncertainty could be dissipated and fairness to future as well as present corporate claimants could be presently established through adjudication. No interest of the corporation's claimants is advanced by denying to the corporation the ability to have such adjudication now under Section 280(a).

Thus, although I do conclude that all of RegO's assets are inadequate to be reasonably likely to provide compensation for all of its future claims that are likely to arise, I conclude as well that the Court of Chancery is not prevented by that fact from approving a security arrangement under Section 280(c) if that arrangement is funded by all of the dissolving corporation's assets and is fair to all classes of present and future claimants. I thus reject Emerson's exception.

## VII.

### The Principal Objections of the Guardian Ad Litem

The guardian makes several fundamental complaints about the proposed plan of dissolution. They were rejected in the Final Report. First, he complains that the Claimants Trust gives some claimants (*i.e.,* those who claim "Pre–Existing Obligations") (*see* p. 17) rights superior to those of future claimants who "based on facts known to the corporation ... are likely to become known to the corporation prior to the expiration of an applicable statute of limitation". In this case, such claimants are statistically likely to become known from time to time until, in the opinion of the guardian's expert, at least the year 2028. They are the "long-tail" claimants (representing the tail of the bell-shaped curve of distribution of product-related injuries). It is unfair, the guardian asserts, to favor present claimants over unknown, yet statistically certain future claimants. More pointedly the guardian asserts a security plan that does so is so inconsistent with the policy of Section 281 that it cannot be approved by the Court as appropriate under Section 280(c). The policy that the guardian infers arises from the fact that Section 281(a) and (b) both provide that where there are insufficient funds to pay or make provisions for all claimants, including foreseeable future claimants, claims of equal priority shall be paid or provided for ratably.[30]

This objection to a perceived preference for present or near term claimants over more distant foreseeable claimants has a second aspect relating to the Airco indemnity contract purchased by the directors following dissolution. This aspect is treated below at pp. 108–09.

The second principal exception of the guardian is that the interim limit of $500,-000 is too high. The guardian asserts that with such an interim limit the trust is quite likely to be exhausted within 8 years, leaving future injured persons with no recourse. Thus, this level of interim limit is likely to advantage claimants who sustain injury in earlier years and are able to bring their claim to judgment or settlement in the earlier years. This again is claimed to be unfair and inconsistent with the direction of Section 281 which requires, it is said,

30. Moreover, future and present tort or contribution claimants share the same priority, the guardian says, because by reason of its statutory definition "the term 'priority', as used in this section, does not refer ... to the relative times at which any claims mature or are reduced to judgment." 8 *Del.C.* § 281(e).

equal treatment for all claimants of the same class.

The guardian proposes a $300,000 interim limit, which based upon his expert's study, would likely be sufficient to permit the trust to pay this amount to all statistically foreseeable injured persons no matter when their claims arise and would, on this expert's view, also be sufficient to fully compensate 95% of all such persons. This issue is addressed at pp. 109–10 below.

A related issue concerning the applicability of an interim limit to indemnification payments is addressed at p. 110 below.

(a) *The guardian's objection to the payment in full of matured or uncontested obligations during the winding-up period.*

█ I am forced to concur with the guardian's reading of the statute insofar as it relates to the sufficiency of the proposed security under Section 280(c). Thus, for the reasons set forth below, I conclude that the differing treatment afforded by the Claimants Trust of present claims ("Pre–Existing Obligations") and claims that are unknown or that have not arisen but that based on facts known are likely to arise, is inconsistent with the express policy of Section 281 and renders the trust, as written, an inappropriate security arrangement under Section 280(c).

\*     \*     \*

It is contended that the enactment of Section 281 changed the law governing payment of claims on dissolution. Prior to enactment of these new provisions, a corporation in dissolution arguably had no obligation to claimants whose claim did not arise until after the termination of the winding-up period. (*See* cases cited at pp. 95–96 *supra*). The complement of that statement is the statement that, previously,

the existence of facts making such future claims very likely, did not, create any ground to impinge upon the ability of existing creditors to be paid in full during the winding-up period. Creditors had a right to be paid in full, if their claim was valid, providing that the dissolved corporation was solvent.

Sections 280 and 281 do incontestably create (or recognize) rights of a certain sort in future claimants.[31] They now have a right under Sections 280 and 281(a) optional procedure for a judicial determination of reasonable security and the funding of that security. Under the default procedure of Section 281(b) future claimants have an entitlement to such provisions as will be reasonably likely to be sufficient to provide compensation for future claims.

But the creation of these entitlements may have consequences not just for shareholders, but also for present creditors. For example, where, under the Section 281(b) procedure, the dissolved corporation does not have sufficient funds to pay all of its obligations and make reasonable provision to pay all contingent and all future claims then, "such claims and such obligations shall be paid or provided for according to their priority and among claims of equal priority, ratably to the extent of funds legally available." Section 281(b). Since "priority" is defined as *"not"* referring "to the relative times at which any claims mature or are reduced to judgment" (Section 281(e)), Section 281(b) must mean that a corporation in dissolution which cannot both pay its present creditors and make adequate provision for contingent and future claims, and which follows the Section 281(b) procedure, is directed not to pay its current creditors in full but to pay them ratably.[32]

31. I have not bothered to restate on each occasion I use the terms "future claimants" or "future claim" the limitations set forth in Sections 280 and 281 (*i.e.,* foreseeability and arising while not barred by applicable statute of limitation), but do mean to imply them in each instance.

32. While in this respect Section 281(b) is no doubt a radical change in the law, it is within the constitutional power of the state of incorpo-

ration to so regulate the dissolution of a domestic corporation, in my opinion. *See, e.g., Riehle v. Margolies,* 279 U.S. 218, 228, 49 S.Ct. 310, 314, 73 L.Ed. 669 (1929), (Brandeis, J.) ("where a statutory proceeding for the winding-up of an insolvent corporation is brought in the state of the incorporation ... assets will be distributed only among those persons who have been found to be creditors either by that court or elsewhere with its leave, and that a judgment recovered in

The optional procedure of Sections 280 and 281(a) does not contain precisely parallel requirements. With respect to future and contingent claimants, a dissolved firm that follows that procedure needs only to pay the security fixed by the court. The statutory language that mandates ratable payments to all claimants of the same priority is only triggered under Section 281(a) when the corporation cannot pay its various claimants and fund the court ordered security. Thus, the new protections created by Sections 280 and 281 for foreseeable future corporate claimants appear to offer less of a threat to the interests of existing corporate claimants when the corporation pursues Sections 280 and 281(a) procedure.

Let me try to relate all of this to this case. The guardian claims that RegO cannot create a security arrangement that one can conclude is likely to reasonably compensate all future claims that are reasonably foreseeable. It argues that therefore, RegO cannot consistently with the scheme of Section 281(a), (b) and (e), pay its present claimants in full (as it has done and the Claimants Trust would do). It is claimed that rather those sections require, in this factual circumstance, that the security arrangement, to be approved, should not prefer present creditors over contingent or future creditors.

RegO's answer (and that of the preferred creditors) is first that the provisions of Section 281(b), which might mandate ratable payment, are entirely irrelevant to this proceeding. Secondly it is said that the requirement of "ratable payment" contained in Sections 280 and 281(a) that are relevant will not be triggered here since RegO can and will pay the security the court fixes under Section 280(c). Thus there will be no inability to make all of the payments that Section 281(a) identifies and therefore there is no occasion for the court, in passing upon the sufficiency of security, to consider the "ratable payment" concept of Section 281.[33]

This argument is nicely technical, but incorrect in my view. RegO cannot claim both that *all of its assets* must constitute "sufficient" security under Section 280(c) regardless of the probability that some foreseeable future claimants will not be fully compensated (*see* pp. 25–26 above), *and* claim that, in passing on the appropriateness of the security proposed, the court should ignore the policy contained in both subsections (a) and (b) of Section 281. While our corporate law statute is a technical statute, we are not authorized by that fact to apply it in ways that defeat the expressed intention of its drafters.

In my opinion, where it appears that all of the assets of a dissolved corporation are likely to be inadequate to compensate all foreseeable future claims, fidelity to the abundantly clear policy of Section 281(a), (b) and (e) requires this court, in passing upon the reasonableness of a proposed security arrangement under Section 280(c), to decline to approve discrimination among claimants of the same class based upon "the relative times at which any claims mature or are reduced to judgment." Section 281(e).

---

another state without leave from it will not entitle the plaintiff to share in the assets."); *In re International Reinsurance Corp.*, Del.Ch., 48 A.2d 529, 536–542 (1946) (discussing *Margolies*). The Full Faith and Credit Clause requires Delaware law to recognize the validity of foreign judgments against a Delaware corporation. Such judgment *conclusively establishes the fact and the amount of liability*, but, analogously to the law of receiverships, full faith and credit does not require that such judgment be paid *other than in conformity with the corporation dissolution law* of the state law substantively governing corporate dissolution. Thus, while in most instances I would agree with the Master's conclusion that "a corporation cannot prevent a creditor during a post-dissolution winding-up period from executing a valid judgment against corporate assets" (Final Report p. 30), I do not believe it is correct that a *valid state law* cannot, in effect, preclude a valid judgment from being paid by a dissolved corporation under certain conditions. It is the law governing corporate dissolution that in this context would be entitled to Full Faith and Credit in those sister-state jurisdictions in which execution of a judgment against a dissolved corporation was sought.

**33.** In addition, RegO doubts the constitutional power or effect of a determination by this court, that present creditors should only be paid *pro rata*. The last point is treated above at note 32.

The Claimants Trust does reflect such discrimination and to that extent, I am forced to conclude that I cannot approve it.

■ This conclusion does not mean that I accept the guardian's suggestion that, where directors who are following a Section 280 procedure have reason to know that the corporation is unlikely to have sufficient assets to assure compensation to all future claimants, they are precluded by Section 281(a) and (e) from paying in full present corporate creditors. While I suppose that the state of incorporation could constitutionally so require, Sections 280 and 281(a), at least, do not do so. They do require the court to approve a security arrangement and in that connection it is appropriate for the court to consider the policy of Section 281(a), (b) and (e). But those provisions do not direct directors of a dissolved corporation to pay existing creditors only ratably when they have reason to know that the corporation will not be able fully to secure the payment of compensation to all foreseeable future claimants.[34]

(b) *The guardian's objections to the treatment of RegO liabilities qualifying for indemnification under the Airco policy.*

■ Following dissolution the directors of RegO caused the Company to purchase, for $15,225,000, a ten year contract of indemnity insurance from American International Reinsurance Company Ltd. ("Airco"). The policy will pay RegO up to $1,000,000 per occurrence and up to $2,000,000 in total per year, as indemnity for sums RegO pays as damages. The policy's term is ten years concluding on December 31, 1998. At the conclusion of the term of the arrangement, if total payments under the policy have not aggregated $20,000,000 million, the unexpended portion will be paid to the Company or its successor.

Thus the indemnity policy carries very little, if any, true insurance. It is rather like a contractual arrangement in which one holds funds at interest subject to a duty to disburse them in a predetermined manner. In entering into this agreement the directors assured that some funds would be available each year through 1998 to satisfy judgments rendered against RegO, even if some judgments that were large enough to otherwise deplete the company's assets were suffered in early years.

The Airco policy gives rise to several issues. The most significant is the question whether, after the Claimants Trust is funded, payments made pursuant to that policy should be limited to amounts permitted by the interim limit. This question involves issues of contract as well as corporate law.

The Airco contract will determine to whom and in what amount Airco is obligated to make payments. As that contract is one of indemnity, Airco is presumably obligated to make payments to RegO or its successor. Thus, the question is whether RegO or its successor will have liability that is not subject to the interim limit, on judgments rendered after the establishment of the Claimants Trust. RegO itself will continue to be a proper party to any lawsuit commenced before dissolution or during the winding-up period. 8 *Del. C.* § 278. But, after the establishment of the Claimants Trust, RegO will no longer have assets to respond to any future judgment. If the Airco contract requires RegO to make a payment to a claimant before Airco is legally obligated to pay, then the establishment of the Claimants Trust will have the effect of subjecting the funds payable under the Airco policy to the overall plan of security for present and future claimants established by the Claimants Trust, because the trust and not RegO will hold title to RegO's property. I assume that this is the case.

If this is so, then the question arises whether the trust should be authorized to pay post-winding-up judgments without regard to the interim limit, where and to the

---

**34.** I express no view on the question whether a corporation dissolving under Section 281(b) has such a duty or on the question whether the holding of *Asmussen v. Quaker City Corp.*, Del.
Ch. 156 A. 180 (1931), which plainly has been overruled with respect to Section 281(b) dissolutions has vitality when a corporation follows the alternative elective procedure.

extent such payments will qualify for indemnification by Airco under its policy.

▮ The guardian asserts that the trust should not authorize treating future claimants differently depending upon whether or not their claim can qualify for payment through the Airco policy. Two of the respondents appearing before the Master and RegO itself assert the contrary: that payments by the Claimants Trust that qualify for indemnification under the Airco policy should not be subject to the interim limit. In support of that position, RegO asserts that "certain claimants had relied upon" the existence of the Airco policy, but it does not state in what way they did so, and whether this reliance was reasonable or was detrimental to them. Beyond this, RegO suggests that purchasing the Airco policy reflected a judgment ("was part of a delicate balance ... between rights of known persons whose claims it had rejected ... and the rights of potential future claimants") that should be respected. This argument misunderstands the Court of Chancery's obligation under Section 280(c). It is the court's duty "to determine the amount and form of security" that will be sufficient or reasonably likely to be sufficient. The court is not here passing upon potential liability of directors where the policy of the business judgment rule is implicated. Rather it stands as the statutorily designated arbiter of the security arrangement that is appropriate. Due respect for the expertise and authority of corporate directors does not dictate deference to their judgment on the question of what constitutes adequate protections to various competing classes of claimants on dissolution.

I am forced to accept the guardian's view of this matter. I cannot render an informed opinion on the question whether the Airco contract obligates Airco to make payments to anyone other than the trust after its establishment, but I am of the view that, insofar as the trust is concerned, the reasoning set forth above (*See* Part VII(a)) requires that the Claimants Trust not favor one set of product liability claimants (those whose claim is asserted and adjudicated or settled while the term of the Airco policy has not expired) over other future claimants whose claims will be subject to an interim limit.[35]

(c) *The guardian's objection to the level of the $500,000 interim limit.*

▮ Having concluded that it would be inappropriate, in the circumstances of this case, to approve a security mechanism that authorized the Claimants Trust to prefer "Pre–Existing Claimants" to "future claimants" (*see* pp. 106–07), one must inquire into what means are appropriately available to implement that view. As the directors of RegO and the court must here deal with likely future events over an undefined term (*see* n. 27 *supra*) mathematical certainty is not possible. Certain of the interested parties recommend a percentage of claim technique in which each claimant is paid a stated percentage of his or her claim on an interim basis, with a final calculation on termination of the trust. Various percentages (from 65% to 80%) are suggested. The Company does not embrace this view, holding that it is impossible to determine fairly what such a percentage should be since it can be determined only after all qualifying future claims are

---

**35.** On a related point, the Master recommended against the Court granting to the guardian power he seeks to institute suit against the RegO directors. The guardian claims that the payment of certain judgments by RegO and the purchase of the Airco policy constituted violations of the equal priority rule among present and future claimants that he finds in Section 281. I accept the Master's recommendation as correct. *See* p. 107–08 *supra*. The decisions attacked were plainly disinterested decisions made in the good faith pursuit of duty. When directors of a dissolved Delaware corporation are, during the course of winding-up corporate affairs, required to make decisions affecting various classes of interest holders, they are protected from liability in doing so, so long as they act disinterestedly, with due care and in good faith. *Devereux v. Berger*, 264 Md. 20, 284 A.2d 605 (1971); *In re Xonics Systems*, 99 B.R. 870 (Bkrtcy.N.D.Ill.1989). Delaware law does not, in my opinions, impose duties on directors of a dissolved corporation of the kind reflected in *N.Y. Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y. 1, 110 N.E.2d 397 (1953). Thus even assuming that the guardian would have standing to bring such a suit, I could not authorize the waste of the estate's assets that such a suit implies.

known. As a consequence of that fact it is impossible to fix a percentage and still have reasonable confidence that the trust corpus will not be rather quickly depleted by a handful of very substantial judgments. I accept the Company's reasoning as consistent with the policy of Sections 280(c) and 281(a) and (e).

The Company proposes instead that an interim limit of $500,000 per claim be tentatively established, and that the appropriateness of that limitation be revisited in five years time in conjunction with the possible establishment of a claims Assertion Date and a trust Termination Date.[36] The guardian and certain other respondents object to this level of limitation as too high. They assert that the best estimates available suggest that use of the $500,000 interim limit will lead to the exhaustion of the trust in eight years, but that the best available estimates suggest that future claims will arise for substantially longer than that.

The Master recommended acceptance of the $500,000 interim limit. In doing so she relied in part upon her conclusion that Sections 280 and 281(a) created no rights in foreseeable future claimants other than a right to be heard (through a guardian to be appointed by the court) and a right to such security as the court may fix or approve under Section 280(c). She rejected the assertion by the guardian that all future claimants have a right under Section 281 to equal treatment in the structuring of the proposed security. She accepted RegO's assertion that a plan that could be expected to pay 90–95% of all claims that occurred over the next eight years was sufficient.

I am constrained to view the requirements of Sections 280 and 281(a) differently. Section 280(c) mandates that security be provided "for claims ... that have not arisen but that based on facts known to the corporation ... are likely to arise ... prior to the expiration of applicable statutes of limitation." This statutory command does not afford to the dissolving corporation, or the court passing upon the proposed security arrangement, an election to fail to afford security for foreseeable claimants who will meet this test, simply because their claims will arise some years hence. The statute might have done so by adopting a limitation provision of the type included in the Model Business Corporation Act (*see* n. 27 *supra*). But, in adopting the limitation provision contained in Section 280(c), the General Assembly left the determination of an appropriate liability cut-off date to the substantive law of the state in which the claim arises. In light of this statutory approach, one cannot now say, in the context of the facts concerning RegO's potential liability situation, that the period implied by the $500,000 interim limit (approximately eight years) is an appropriate point to terminate all rights of future claimants against the sole remaining potential defendant—the Claimants Trust.

The guardian's suggested interim limit of $300,000 per claim could be expected (or at all events is certainly more likely) to permit the trust to satisfy claims (to that extent) for the entire period in which it is reasonable to predict that claims will arise. That this implies a trust of long duration is not itself problematic when the interests of all foreseeable future claimants are considered, as Section 280(c) indicates they must be.

Since I find no basis in the statute at this point to foreclose distant claimants from protection from future injuries, I must decline to approve this aspect of the Claimants Trust, but will approve an interim limit of $300,000.

(d) *Should the interim limit apply to indemnification claims that arise hereafter.*

■ As I understand this aspect of the matter, RegO has volunteered that indemnification payments arising out of any litigation challenging the propriety of the Asset Purchase Agreement be limited by the interim limit. The parties dispute then whether any indemnification from the trust to RegO officers and directors is appropriate, and if it is, whether the interim limit should apply to all such future payments, if any. I accept the recommendation of the

---

**36.** *See* pp. 101–02, *infra.*

Master (Final Report pp. 49–52). Plainly future indemnification claims are liabilities that the trust can and should accept. More importantly those claims legitimately deserve a priority and thus exception from the interim limit for several reasons. The express policy of Section 145 of the Delaware General Corporation Law provides one ground. More fundamentally, the innovative dissolution procedures of Sections 280–82, which confer benefits upon future claimants, will be less utilized than otherwise, if corporate directors who voluntarily employ those procedures can do so only at the cost of giving up existing indemnification rights. Thus, realization of the apparent objects of the statute will be promoted by recognizing the priority of such claims.

## VIII.

### Other Disputed Matters: A Claims Assertion Date

■ The Claimants Trust includes a provision authorizing the trustee, after five years, to recommend and apply to this Court for the determination of a date after which the trust will not be authorized to pay any claims not asserted by that date.

Emerson Electric objects to the inclusion of any such provision calling it unauthorized by Sections 280 or 281. In the alternative, several Respondents urge that in no event should less than ten years of experience be had before any such date is considered.

This provision appears to be an attempt to deal with the massive uncertainty created by the nature of the Company's product liability history and prospects and the limitations provision of Section 280(c). In my opinion, a provision of this type is permitted by Section 280(c) since its command is to fix "security which will be reasonably likely to be sufficient." There may come a time in the administration of the trust when it can responsibly be concluded that no further claims are likely to arise. At that point termination of the trust will be appropriate. A Claims Assertion Date would present a helpful mechanism to give notice to the world of termination of the trust.

Given the claims history and prospects of the Company however, in my opinion, in no event could such a termination occur here in as little as five years. See, e.g., "RegO Product Claims (Occurrence Dates After 1/1/77) As of September 20, 1991," Guardian's App.Exh.E. When the directors purchased the Airco indemnity policy they contracted for indemnity through the year 1998. Indeed, the record suggests that this Trust may have to exist substantially longer than ten years. RegO suggests that nothing is lost by permitting the trustee to petition to terminate the Trust in as little as five years. But this is not the case. An application to reconsider the matter of trust termination will not be without cost—to the trust, to the claimants and to the public that underwrites the expense of these proceedings. To incur those expenses in as little as five years, on this record, seems wasteful. Given the experience that RegO has had, one can conclude that only a statute of the type reflected in the Model Corporation Act would justify, on these facts, termination in less than ten years, if then, in my opinion.

A number of additional matters involving details of trust administration and the identity, powers and compensation of the trustee will be treated in a separate ruling to be issued contemporaneously with this already lengthy opinion.

\* \* \*

For the foregoing reasons the exceptions of the guardian ad litem to the Final Report are accepted to the extent set forth above. Therefore, I am required to decline to approve the proposed security arrangement but would approve, as sufficient in the circumstances, a trust that complied with the foregoing.