# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF GLOBAL SAFETY LABS, INC.   )
                     )

C.A. No. 2022-0309-JTL

## OPINION

Date Submitted: April 5, 2022
Date Decided: May 12, 2022

Marc S. Casarino, Karine Sarkisian, KENNEDYS CMK LLP, Wilmington, Delaware; *Attorneys for Petitioner*.

**LASTER, V.C**

Global Safety Labs, Inc. (the "Company") is a Delaware corporation that has dissolved and is winding up its affairs. The Company has petitioned the court for determinations under Section 280 of the Delaware General Corporation Law (the "DGCL") regarding its obligations to post security for claims. Dkt. 1 (the "Petition" or "Pet.").

The Petition is a bare-bones four-page document consisting principally of conclusory averments. It is not an outlier. It is representative of petitions that the court sees regularly in cases involving defunct or dissolved entities and in proceedings involving assignments for the benefits of creditors. Many of these proceedings are handled *ex parte*, so the court never has the benefit of an interested party that can provide a different perspective or ask probing questions.

In these types of proceedings, the court requires more information, including about the entity, its history, the path that led to the relief being sought, and the parties who could be affected by the relief. Counsel are in the best position to determine what information is material to the court's decision, and in an *ex parte* proceeding, counsel have a heightened obligation to provide information to the court.

A first-day declaration in a bankruptcy proceeding provides a helpful model. The court is not trying to convert a Court of Chancery proceeding involving a defunct or dissolved entity into a bankruptcy case. Counsel must make case-by-case determinations about the information the court should have. Nevertheless, the concept of a first-day declaration can serve as a guide. The court will defer scheduling anything further in this matter to allow the Company to file an affidavit providing additional information about the Company and its request.

## I. FACTUAL BACKGROUND

The facts are drawn from the Petition, which is brief and conclusory. The Petition attaches various exhibits, but those exhibits consist of formal legal documents, such as implementing resolutions. They share the Petition's embrace of minimalism.

The Company is a Delaware corporation that was incorporated on March 13, 2006. Pet. ¶ 3. The Petition does not say how or why it came to be formed. Was it a startup? Was it formed by an existing concern? Was it a subsidiary within a larger structure? The certificate of incorporation attached to the Petition shows that Michael Hayes Freeman of Tulsa, Oklahoma, incorporated the Company. *Id.* Ex. A. Is his identity significant?

The Company had its principal place of business in Tulsa, Oklahoma. *Id.* ¶ 2. The Petition does not say anything about the Company's business. What did it do? The name of the Company suggests that it had something to do with laboratories and safety and that it aspired to operate globally. That could cover quite a bit.

The Petition does not say anything about the Company's organizational structure. Was it a holding company? Did it have subsidiaries? Did it have affiliates?

On April 30, 2021, the Company's board of directors resolved through action by unanimous consent to dissolve and liquidate the Company. *Id.* ¶ 4. The Petition does not say why. The resolution does not either. The directors who approved the resolution were Larry Bump, Tom Wright, and Marty Rowland. *Id.*, Ex. B at 2. The Petition later states that Rowland is the Company's president. *Id.* ¶ 7. The other two are just names.

2

The Petition does not say anything about what happened between 2006 and 2021. Did the Company's business ever get off the ground? Did it succeed and then fail? Did the Company prosper, sell its assets, and decide to liquidate? The possibilities are endless.

Also on April 30, 2021, holders of a majority of the Company's outstanding common stock acted by written consent to approve a Plan of Complete Liquidation and Dissolution dated April 30, 2021 (the "Plan"). *Id.* ¶ 5. The Petition does not say who the voting stockholders were. The written consent identifies:

- Larry J. Bump as Trustee of the Larry J. Bump Trust, holding 15,896,748 shares;

- Elaine Thiele as surviving joint tenant owning 22,994,748 shares; and

- W. Kent Dunbar as Trustee of the W. Kent Dunbar 1994 Trust dated 11/02/1994, holding 2,500,000 shares.

*Id.*, Ex. C at 2. That seems like a lot of shares. And that reaction highlights the fact that the Petition says nothing about the Company's capital structure. Was the Company a privately held entity throughout its lifetime? Was it closely held by its founders? Did it accept money from outside investors? Was it ever publicly traded?

Seven weeks later, the Company sent notice of the action taken by written consent to the non-consenting stockholders. *Id.* ¶ 6. The Petition does not explain the delay.

The Petition does not say who the non-consenting stockholders were. An exhibit identifies fifty-four names. *Id.* Ex. C-1. Can anyone say anything about those investors? Were they friends and family? Were they angel investors? Were they employees? A mix?

3

The Plan appointed Rowland to serve as trustee to take charge of winding up the Company's affairs. *Id.* ¶ 7. The Petition does not provide any other information about Rowland.

On August 3, 2021, the Company filed a certificate of dissolution with the Delaware Secretary of State. On September 20, 2021,

> [the Company] mailed a Notice of Dissolution to All Claimants of Global Safety Labs, Inc. (the "Notice of Dissolution") to all persons or entities having a known claim against [the Company], other than a claim against [the Company] in a pending action, suit, or proceeding to which [the Company] is a party, and to any person or entity with a contractual claim against [the Company], contingent upon the occurrence or nonoccurrence of future events or otherwise conditional or unmatured, and requested those receiving notice to present any such claim as directed in the notice, and advised such parties that any claims not presented in accordance with the notice would be barred.

*Id.* ¶ 9. The Petition does not explain how the Company made the necessary determinations.

The Company published the Notice of the Dissolution once a week for two consecutive weeks in the New Castle Weekly and in The Tulsa World. *Id.* ¶¶ 10–11.

The Company did not receive any notices of claims in response to the notices and publications. The Company is not aware of any litigation against it. *Id.* ¶¶ 13–14.

The Company maintains that it "no longer conducts business in any capacity, but operated in the period since dissolution solely for the purpose of providing for the satisfaction of its obligations and winding up its business." *Id.* ¶ 15. That is a legal truism about what winding up means.

The Company states that it has not employed any individuals since December 31, 2020. *Id.* It does not say how many individuals it employed before that date or what

4

happened to them. The Company represents that it does not anticipate any future claims against it. The Company does not provide any explanation why.

The Company represents that all of its assets "have been and/or will be distributed only to secured claimants because [the Company's] assets available for distribution are less than what is owed to the secured claimants." *Id.* ¶ 16. That is an important fact. The Petition offers only the barest of information about the nature and magnitude of the Company's assets or liabilities. The Petition states that "the aggregate value of secured liabilities claimed against [the Company] is at least $12 million and the value of [the Company's] monies and assets available for priority distribution to [the Company's] secured claimants do not exceed $500,000, leaving [the Company's] secured claimants with a deficiency claim of at least $11.5 million." *Id.* ¶ 17. The Petition does not provide any meaningful information about who the secured claimants are. It does not describe the nature or origins of the secured claims. It does not say anything about what distributions have been made.

Based on this presentation, the Company asks the court to determine that it "shall not be required to set aside additional funds as security to provide compensation for unsecured claims, claims that have not been made known to [the Company], have not yet arisen, or may arise within five (5) years of the date of dissolution." *Id.* ¶ 20(a).

Counsel seems to believe that the Petition, standing alone, is sufficient. In a letter addressed to "Judge Travis," counsel states: "Should a hearing be required for the resolution of this matter, [the Company] respectfully requests that a hearing be scheduled at the Court's convenience." Dkt. 2. The implication is that a hearing is not necessary.

5

## II. LEGAL ANALYSIS

Sections 280 and 281(a) of the DGCL establish an optional, court-supervised process that a corporation can follow to wind up its affairs (the "Elective Path"). *In re Altaba, Inc.* (*National Claims Decision*), 264 A.3d 1138, 1143 (Del. Ch. 2021). Compliance with the Elective Path "enable[s] the corporation's shareholders and directors to avail themselves of a 'safe harbor' from post-dissolution liability." *In re Krafft-Murphy Co.*, 82 A.3d 696, 701 (Del. 2013).

The Elective Path creates a mechanism that enables the corporation to force known claimants to accept or challenge the corporation's proposed amounts of security up front, while also enabling the corporation to obtain court-approved determinations regarding any disputed amounts. *National Claims Decision*, 264 A.3d at 1158. In summary, the Elective Path contemplates the following steps:

(i)      The dissolved corporation gives notice of the corporation's dissolution to all persons having claims against the corporation other than claims already in litigation. *See* 8 *Del. C.* § 280(a)(1).

(ii)      Claimants then must present their claims in writing before a specified date, no earlier than sixty days from the date of the corporation's notice, to preserve their claims. *See id.* § 280(a)(1)(c), (a)(2).

(iii)      The dissolved corporation may reject any timely presented claim in whole or in part, at which point the rejected claim is lost if the claimant does not commence an action, suit, or proceeding with respect to the claim. *See id.* § 280(a)(3)–(4).

(iv)      The dissolved corporation may offer security to a claimant for an unrejected claim, which is deemed accepted "as the sole source from which to satisfy the claim against the corporation" if the claimant does not object within 120 days. *See id.* § 280(b)(2).

6

(v)    The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be sufficient to provide compensation" for any claim where the corporation's offer of security was rejected. *See id.* § 280(c)(2).

(vi)    The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party." *See id.* § 280(c)(1).

(vii)   The dissolved corporation "shall petition the Court of Chancery to determine the amount and form of security which will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 5 years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years after the date of the dissolution." *See id.* § 280(c)(3).

After following this process, paying or providing for claims, and posting the required security, "[a]ny remaining assets shall be distributed to the stockholders of the dissolved corporation." *Id.* § 281(a).

The Elective Path thus requires that the Court of Chancery determine (i) "the amount and form of security that will be sufficient with respect to any contract claim that is contingent, conditional or unmatured (excepting claims on implied warranties)," and (ii) "the amount and type of security which will be reasonably likely to be sufficient to provide compensation for all other [*i.e.*, non-contractual] future claims that have not arisen but that based on facts known are likely to arise." *In re RegO Co.*, 623 A.2d 92, 97–98 (Del. Ch. 1992) (cleaned up). The burden is on the Company to establish the amounts and forms of security that will satisfy the statutory tests. *National Claims Decision*, 264 A.3d

7

at 1144; *accord In re Altaba, Inc.* (*Interim Security Decision*), 241 A.3d 768, 775 (Del. Ch. 2020).

Determining the amount of security is a challenging exercise that necessarily involves prediction. "An observation attributed variously to Mark Twain, Yogi Berra, and Niels Bohr (among others) holds true for dissolution: It's difficult to make predictions, especially about the future." *Interim Security Decision*, 241 A.3d at 776. That challenge is particularly difficult for unliquidated and contingent contractual claims, where the variables are many and the certainties few. *See In re Altaba, Inc.*, 2022 WL 1133125, at *2 (Del. Ch. Apr. 18, 2022). Chancellor Allen observed dryly that "such a judgment will inevitably present a task that requires much thought." *Boesky v. CX P'rs, L.P.*, 1988 WL 42250, at *16 (Del. Ch. Apr. 28, 1998).

There are situations where the task is much simpler. If, for example, there is a secured creditor with a properly perfected security interest and indisputable priority to claim all of the corporation's assets, then setting security for the junior claims becomes a trivial matter. Even if those claims proceed to judgment for astronomical amounts, the junior claimants will not have any right to collect.

The Petition attempts to depict a corporation that fits the simplified mold. The problem with the Petition is its parsimony. The Petition is short, and the bulk of its allegations are formulaic. The averments note the dates of legally operative events, such as the Company's formation, the adoption of the Plan, and the Company's dissolution. The Petition provides no meaningful information about what the Company did or the arc of its existence. The fifteen year life of the Company's artificial personhood is reduced to a

desolate recitation of dates. As Justice Jack B. Jacobs once observed, a dissolution proceeding is like a funeral (or celebration of existence), and the judges and lawyers who preside over the proceeding administer those rites. *See* Jack B. Jacobs, *Delaware Receivers and Trustees: Unsung Ministers of Corporate Last Rites*, 7 Del. J. Corp. L. 251 (1982). May none of our own eulogies be so dry.

What the Petition lacks, and what the court invariably needs, is context. The bankruptcy courts and their practitioners have developed a vehicle for providing that context through a submission known as a "First-Day Declaration" or a "First-Day Affidavit." *See, e.g.*, S.D.N.Y. L. Bankr. R. 1007-2, *available at* http://www.nysb.uscourts.gov/sites/default/files/LocalRules2017.pdf. This case calls out for a comparable declaration, tailored by skilled counsel to provide the information that the court needs to evaluate the Petition (the "Supporting Declaration").

Typically executed by a senior officer of the debtor or person of similar authority, a First-Day Declaration describes the need for relief, the impact of the relief on the debtor and its creditors, and the expected benefits that the relief will generate. A First-Day Declaration also describes the debtor's business and the debtor's organizational and capital structure and explains why the debtor sought relief. *See* 15 Collier on Bankruptcy § 18.09[3] (16th ed. 2022), LexisNexis (database updated Apr. 2022). The Supporting Declaration should provide similar information regarding the Petition.

To prepare a First-Day Declaration, counsel works with the debtor's principals and reviews the relevant books and records. Counsel also obtains information through discussions and interviews with the debtor's management. It is not enough for counsel

9

simply to consult a handful of sterile resolutions. To prepare a Supporting Declaration, counsel should engage in similarly appropriate efforts.

A member of the debtor's senior management team ordinarily executes a First-Day Declaration, which begins with a description of the declarant's position, experience, and related information to support the declaration's averments. That information typically includes:

- All positions currently held by the declarant.

- The duration of the declarant's association with the debtor and all past positions held during that period.

- Experience prior to joining the debtor.

- Responsibilities with the debtor.

- Education and degrees held.

Rowland appears to be the appropriate person to execute the Supporting Declaration, and it should provide similar information about him. The Supporting Declaration also should disclose any information that could affect Rowland's credibility, such as any entanglements with the law. *See In re VBR Agency, LLC*, — A.3d —, 2022 WL 1252237, at *4 (Del. Ch. Apr. 20, 2022).

A First-Day Declaration generally contains one or more sections describing the debtor's business, its corporate and capital structure, and the events leading up to the bankruptcy. The description of the debtor's business normally contains a section outlining the debtor's history, including the nature of the business and how it fared over time. Topics may include the debtor's expansions into new territories, mergers and acquisitions, and

new services, products, or business lines. The level of detail will depend, in part, on the size and complexity of the debtor's operations. The description also typically details the debtor's different business segments and their respective operations and includes information about revenue and income during recent years. The descriptions also include information pertaining to assets and liabilities. The Supporting Declaration should cover these matters as well.

A First-Day Declaration usually will include sections describing the debtor's organizational and capital structure. The description of the debtor's organizational structure should detail any relationships between the debtor and other non-debtor entities, such as parent companies, holding companies, joint ventures, subsidiaries, and affiliates. The description should include information about each entity or group of entities, including their business operations and employees. The First-Day Declaration also explains any financial relationships between the entities.

The description of the debtor's capital structure details the debtor's loan agreements, including the parties to and dates of the agreements as well as any relevant facts concerning loans, such as their purpose. The declaration specifies the loan terms, the extent and priority of any security interests, the amounts outstanding, the loan payments, and maturities. The section also describes any intercompany loans, guaranties, non-debtor financings, and related obligations. The section also provides information regarding the debtor's unsecured debt obligations.

11

The Supporting Declaration should provide similar information. It should address the Company's organizational structure. It should describe the Company's capital structure. It should address both the debt side and the equity side of the balance sheet.

A First-Day Declaration generally describes the events leading up to the bankruptcy filing, and it goes beyond a recitation of legal events. A debtor's financial distress is usually caused by poor financial performance and insufficient capital. A First-Day Declaration describes the reasons for the debtor's financial distress and the need for bankruptcy relief. The description typically includes an overview of the debtor's industry and market and explains whether external factors contributed to the debtor's distress. A First-Day Declaration also typically addresses any alternatives to bankruptcy that were explored.

The Supporting Declaration should provide comparable information. It should describe the events leading to the Company's dissolution. It should identify any alternatives to dissolution that the Company explored. It should describe why the option of dissolution was chosen. It should explain what the Company hopes to achieve and why.

This discussion is intended to provide a starting point. The purpose of the exercise is not to require costly filings. The point is to ensure that the court has the information it needs to understand and evaluate the petition.

Counsel are in the best position to determine the information that the court needs to have. Counsel should ask themselves what information they would like to know before providing advice to an entity about its prospects for seeking relief under Section 280. Counsel might also consider what type of information they would share with a colleague if they were asking for input or advice. It seems unlikely that counsel would stop after an

arid recitation of the dates on which particular events took place. Counsel are also requested to take particular care when making an application that is likely to be considered *ex parte* so that the court has the information it needs when rendering its decision.

### III. CONCLUSION

The Petition seeks relief under Section 280. The court does not have sufficient information on which to make a ruling. Counsel may supplement the record to address the issues identified in this decision and any other matters that they believe should be brought to the court's attention. Once this has occurred, counsel shall seek a conference with the court to discuss next steps.