# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| IN RE RIVIERA RESOURCES, INC. | ) | C.A. No. 2022-0862-JTL |
| | ) | |

## OPINION ADDRESSING APPOINTMENT OF GUARDIAN AD LITEM
## UNDER SECTION 280(a)(3)

Date Submitted: February 15, 2023
Date Decided: March 20, 2023

Kevin M. Gallagher, Alexander M. Krischik, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Petitioner Riviera Resources, Inc.*

Joseph L. Christensen, CHRISTENSEN & DOUGHERTY LLP, Wilmington, Delaware; R. Brent Blackstock, Courteney R. Sturgell, BRENT BLACKSTOCK PLC, Tulsa, Oklahoma; *Attorneys for Claimants Prosser Group Investments II, LLC and Magness Energy, LLC*.

Willie-Jay:Smith-Bey III, Los Angeles, California; *Pro Se Claimant*.

**LASTER, V.C.**

From April 2018 until December 2020, Riviera Resources, Inc. (the "Company") operated an upstream petrochemicals business that involved acquiring and operating existing oil and gas wells. The Company owned thousands of wells scattered across Colorado, Illinois, Kansas, Michigan, Louisiana, New Mexico, Oklahoma, and Texas.

After selling off its operating assets, the Company dissolved and elected to wind up its affairs using the optional, court-supervised process contemplated by Sections 280 and 281(a) of the Delaware General Corporation Law (the "DGCL"). That process involves identifying and giving notice to known claimants, accepting or rejecting claims, and paying or establishing reserves for the accepted claims. The dissolved corporation can petition the Court of Chancery to determine the amount of any reserves where the form and amount of security is disputed. The dissolved corporation must petition the Court of Chancery to determine an amount and form of security which will be reasonably likely to be sufficient to provide compensation for unknown claims which, based on facts known to the corporation, are likely to arise or to become known to the corporation within five years after the date of the dissolution, or a longer time of up to ten years if required by the court.

The Company and its counsel have done an exemplary job sending notices to known claimants, accepting and rejecting claims, and establishing reserves for known claims. During a hearing on the Company's petition, the Company's lone remaining officer testified credibly and forthrightly about the process. At the conclusion of the hearing, the court adopted the Company's proposed forms and amounts of security for all known claims.

The only issue that remains is the amount of security for unknown claims. The Company seeks a determination that $10 million is reasonably likely to provide sufficient security for unknown claims that have not yet arisen or are likely to arise or to become known to the Company during the statutory default period of five years. Implicit in this request is a determination that a longer period is unnecessary.

The DGCL authorizes the court to appoint a guardian ad litem to represent the interests of unknown claimants and to assist the court in determining whether the petitioner's proposed amount and form of security is sufficient. The Delaware courts have not considered how a court should exercise its discretion in determining whether to make an appointment. After considering related areas of the law, this decision concludes that discretion should be exercised freely in favor of appointing a guardian, particularly where the guardian can supplement the efforts of counsel, bring to the court's attention broader legal or policy implications, and assist the court in avoiding error.

Those considerations apply in this case. The Company operated in the oil and gas industry, so unknown environmental claims present an obvious risk. The Company did not address that issue. When the court raised it, the executive testified that the buyers of the Company's assets assumed any risk of environmental claims. That is helpful, but it does not mean that the Company does not face potential liability. The Company also retained the risk for the non-operating wells that it did not sell.

The executive did not know of any method of estimating the risk of environmental claims associated with oil and gas wells, but someone must. The global petrochemical industry involves some of the largest companies in the world and operates in a $500

2

billion market. For the past forty years, the industry has faced the risk of significant environmental liabilities. It is hard to believe that men and women with science degrees (as opposed to JDs) have not examined the rates at which oil and gas wells leak and developed methods for assessing the likelihood of leaks across a portfolio of wells. It is hard to believe that accountants, actuaries, and statisticians have not developed ways of estimating the contingent liabilities associated with those risks. Perhaps this corner of the map of human knowledge truly remains marked with the warning, "Here Be Dragons." At this point, no one has attempted to scout the terrain.

The lack of a meaningful record about environmental claims makes this case suitable for the appointment of a guardian ad litem, who will play an important role in supplementing the efforts of counsel. The guardian can further assist the court by identifying broader the legal or policy implications raised by the case.

The guardian will represent the interests of unknown claimants, with a particular focus on potential environmental claimants. The guardian's work will proceed in stages. The initial task will be to contact universities with petroleum engineers, geologists, and other people of science, speak with the department heads or other knowledgeable individuals, and find out if there are ways of assessing this risk. The guardian also will contact firms with expertise in accounting for contingent liabilities to explore whether it is possible to put a number on the risk. The guardian need not search to the ends of the earth. A reasonable inquiry will suffice.

If the answer is "no, there are no methods," then the guardian can report back with that information and the court can take that into account. If it turns out that methods exist,

then the guardian will report on what applying them would entail and the level of insight that the methods could provide. Information is costly, and it would not make sense to expend large amounts for little benefit. But were there a method that could provide cost-effective support for meaningful assessment, then that would be worth pursuing.

The Company has not carried its burden of proof on the form and amount of a reserve for unknown claims. The Company's request for an order approving its proposed form and amount of security is held in abeyance. The court will implement this decision and appoint a guardian by separate order.

## I.      FACTUAL BACKGROUND

Trial took place on February 15, 2023. The documentary record consists of thirty-three exhibits. One witness testified live. The evidence supports the following findings of fact.

### A.      Linn Energy, LLC

The Company is one of several corporate descendants of Linn Energy, LLC ("Original Linn"). That entity had the distinction of being the first upstream petrochemical business that issued units to the public and was treated for tax purposes as a master limited partnership (an "MLP"). Midstream petrochemical businesses have long made use of the MLP form, but the Company was the first upstream business to deploy it.

Original Linn acquired and operated mature assets that were already producing oil or natural gas. The resulting business generated consistent free cash flows and supported quarterly distributions for unitholders.

As the first publicly traded upstream MLP, Original Linn experienced early success. Over time, Original Linn assembled a geographically diverse asset base located in oil and gas producing regions throughout the United States, including in the Hugoton Basin, the Permian Basin, the Rockies, Oklahoma, Southern Texas, Eastern Texas, Northern Louisiana, California, Michigan, and Illinois.

Other operators saw the benefits of Original Linn's business model, and twelve other upstream MLPs emerged. As the market became crowded, competition for assets increased. The industry suffered reversals from 2012 until 2016, when commodity prices for oil and gas decreased significantly. By 2017, all of the publicly traded upstream MLPs had filed for bankruptcy, including Original Linn.

## B. Original Linn's Successors

Original Linn and its affiliates filed for bankruptcy in May 2016. At the time, Original Linn's creditor profile consisted of senior secured bank debt, publicly traded bonds, and miscellaneous trade debt. Two distressed debt funds had acquired virtually all of the Company's bonds. The bonds were the fulcrum security in the bankruptcy, and the distressed debt funds spearheaded the development of Original Linn's plan of reorganization.

In January 2017, the bankruptcy court approved the plan of reorganization. In February, Original Linn emerged from bankruptcy.

Viewed at a high level, the plan of reorganization resulted in the transfer of the bulk of Original Linn's operating business, free of any liabilities, to a clean, newly formed entity called Linn Inc. The new entity ended up only existing for one year and

5

functioned merely to channel assets to the Company, so this decision calls it "Transitional Linn."

Based on the fact that it would own Original Linn's assets, Transitional Linn raised capital in the form of secured debt. The holders of Original Linn's bonds (primarily the distressed debt funds) exchanged those securities for bonds issued by Transitional Linn.

Meanwhile, Original Linn transferred its assets to Transitional Linn in two steps. Original Linn first transferred its assets to a newly formed subsidiary, Linn Energy Holdco II LLC ("HoldCo"). HoldCo then sold the assets to Transitional Linn in return for $530 million in cash plus a formula-generated number of shares of stock of Transitional Linn, but in no event more than 49.90% of Transitional Linn's equity.

After receiving the cash and stock from Transitional Linn, HoldCo distributed the cash and stock to Original Linn, and Original Linn dissolved. In the resulting liquidation, Original Linn's senior secured creditors received the cash and stock.

After Transitional Linn had acquired Original Linn's assets from HoldCo, the holders of Transitional Linn's unsecured bonds (primarily the distressed debt funds) converted their debt into shares of common stock. Transitional Linn emerged with a capital structure consisting of secured debt and common stock. The distressed debt funds who had bought up Original Linn's unsecured debt now owned a majority of Transitional Linn's equity.

To raise additional capital, Transitional Linn sold all of its properties located in California and Southern Texas to third parties. This seems to have happened through a series of transactions rather than as one single transaction.

In 2018, Transitional Linn decided to reorganize again. Transitional Linn formed the Company, transferred all of its remaining assets to the Company, and took the Company public through an offering of 25% of its stock. Transitional Linn then spun off the Company by distributing the remaining 75% of the Company's stock to Transitional Linn's stockholders.

Through this process, the Company ended up owning the bulk of Original Linn's operating business, free of the debts and other liabilities that had burdened Original Linn. The former creditors of Original Linn, including the distressed debt funds, owned over 75% of the shares of a publicly traded entity. The Company's board of directors (the "Board") was populated with representatives of the distressed debt funds.

## C.     The Board Decides To Liquidate The Company.

Except for the transferred properties located in California and Southern Texas, the Company operated the same business as Original Linn. Its assets were designed to generate cash flow that could be used to support distributions to income-oriented investors. The Company's stockholder base, however, consisted predominantly of Original Linn's former creditors. The public float was relatively small, and the stock traded poorly.

The distressed debt funds who controlled the Board had hoped to use the public markets as a source of liquidity. For that to happen, they needed to increase the depth of

7

the public float. Various financial advisors evaluated a range of options, including (i) moving the Company's listing to a major exchange and completing a secondary offering, (ii) merging with other upstream operators, and (iii) completing asset acquisitions to increase the scale of the business.

The Board ultimately decided not to pursue any of those options, choosing instead to liquidate the Company's assets and return capital to stockholders through a series of stock repurchases and cash dividends.

Between 2018 and 2020, the Company sold off the bulk of the Company's assets. By July 2020, the only assets the Company owned were properties in Northern Louisiana and Oklahoma and a natural gas processing facility owned by a subsidiary. By August, the Company had entered into definitive agreements to sell those remaining assets.

By selling off substantially all of its assets, the Company generated a significant pool of cash to distribute to its stockholders. In 2019, the Company distributed approximately $250 million. Dkt. 1 ¶ 43. In 2020, the Company distributed approximately $180 million to its stockholders. *Id.*

**D.     This Proceeding**

With its assets reduced to approximately $72 million, the Board opted to dissolve and follow the optional, court-supervised path contemplated by Sections 280 and 281(a) of the DGCL (the "Elective Path"). On October 12, 2020, the Board approved a resolution calling for the Company's dissolution. That same day, the Company's stockholders acted by written consent to approve the dissolution.

8

At a high level, the Elective Path calls for the dissolved corporation to give notice to known creditors so that they can present their claims by a specified date. The dissolved corporation rejects or accepts the presented claims and either pays or offers security for the claims it accepts. If a party's claim is rejected, the party must file suit within a statutorily specified period. If the party disputes the form or amount of security, then the dissolved corporation can file a petition seeking judicial determinations of the amount and form of security appropriate for the claim. The dissolved corporation must petition for judicial determinations of the amount and form of security that will be reasonably likely to be sufficient for unknown claims.

The Company had significant known claims. Against assets of approximately $72 million, the Company identified liabilities of approximately $45 million. The Company's net assets were thus approximately $27 million.

Between December 21 and December 31, 2020, the Company mailed notices to more than 78,600 actual and potential claimants to notify them of the Company's dissolution and the deadline to assert a claim. On December 22, the Company published notice of its dissolution in the *News Journal*, a newspaper of general circulation in the county where the Company's registered agent is located, and in *USA Today*. On December 29, the Company published notice of its dissolution in the *Houston Chronicle*, a newspaper of general circulation in the county where the Company's principal place of business is located.

On September 26, 2022, the Company filed a petition seeking judicial determinations regarding the amount and form of security reasonably likely to be

sufficient to provide compensation for (i) claims that were the subject of a pending action, suit, or proceeding to which the Company is a party, and (ii) other claims asserted in response to the Company's notices, to the extent the parties had not reached agreement. As of the date of the filing of the petition, the Company had received 295 claim letters responding to the Company's notice.

As required by Section 280(c)(3), the Company also sought a judicial determination regarding the amount of security reasonably likely to be sufficient for claims that had not been made known to the Company, or that have not yet arisen but are likely to arise or become known within five years after the date of dissolution of the Company, or a longer period of not greater than ten years as determined by the Court of Chancery. The Company proposed to reserve $10 million for unknown claims.

Finally, the Company sought judicial approval for its reserve for the costs and expenses necessary to complete the winding up process.

The Company estimated that if the Court adopted its proposals, then the Company could distribute approximately $18.8 million to its stockholders. To its credit, the Company did not seek an interim distribution. That type of motion forces a court to make difficult determinations regarding security on a paper record. Doing so exacerbates the risk that the court will authorize an excessive distribution and leave claimants with insufficient security. *See In re Altaba, Inc.*, 241 A.3d 768, 775–78 (Del. Ch. 2020).

The Company was able to resolve the vast majority of claims without judicial involvement. The Company rejected numerous claims, and the holders of those claims

did not pursue timely relief. The Company reached agreement on the amount and form of security necessary to resolve many other claims.

## E.      The Evidentiary Hearing

The court scheduled an evidentiary hearing for February 15, 2023. By the time of the hearing, only three issues remained.

First, claimants Prosser Group Investments II, LLC and Magness Energy, LLC (together, "Prosser") opposed the Company's proposed reserve of $300,000 for potential liability stemming from litigation between the Company and Prosser. Dkt. 9. Prosser requested a reserve of $1 million. *Id.* ¶ 36. At the hearing, the Company agreed to raise its reserve for litigation with Prosser to $1 million, mooting Prosser's objection.

Second, claimant Willie-Jay:Smith-Bey III opposed the Company's proposed reserve of zero dollars for a claim to purported mineral rights associated with one of the Company's properties in Texas. Dkt. 7. He requested a reserve of $5.5 million.

Third, the Company asked the court to determine that a reserve of $10 million was reasonably likely to provide sufficient security for unknown claims that have not yet arisen but are likely to arise or to become known to the Company during the statutory default period of five years.

The only witness who testified during the hearing was David Rottino, the Company's President and CEO. He is the Company's sole remaining employee. He also serves on the Board.

Rottino has over two decades of experience in the oil and gas industry. He is plainly knowledgeable about the Company and its industry, and the court found Rottino's testimony credible.

Based on the Company's evidentiary showing, the court adopted the Company's proposals for the amount and form of security for all known claims and potential liabilities attributable to identifiable claimants. The only disputed amount was Smith-Bey's claim, and the court agreed with the Company that an earmarked reserve for that claim was unnecessary, effectively approving a reserve of zero. In total, the court approved a reserve in the amount of $1 million for the known claimants. Dkt. 14.

The court took under advisement the Company's proposal for security for wind-up costs and unknown claims. During the hearing, Rottino said little about unknown claims and nothing about the possibility of environmental claims. When the court asked about the subject, Rottino explained that the acquirers of the Company's assets had assumed the risk of environmental liabilities associated with those claims and committed contractually to indemnify the Company. He did not know of any method for assessing the risk of environmental claims.

## II.    LEGAL ANALYSIS

Before 1987, Delaware lacked a statutory mechanism for obtaining a judicial determination of the form and amount of security that would be reasonably likely to be sufficient to provide for unknown claims. Directors were responsible for establishing a form and amount of security that would be reasonable before distributing remaining amounts to stockholders. If the amount of security proved inadequate, then the claimants

12

could attempt to recover from the directors. *See In re Transamerica Airlines, Inc.*, 2006 WL 587846, at \*7 (Del. Ch. Feb. 28, 2006). The stockholders who received distributions also faced the risk that claimants could claw back amounts they had received. 2 David A. Drexler et al., *Delaware Corporation Law and Practice* § 38.05[7], at 38-24 to 24.1 (2022).

Historically, the absence of a procedure "was not a cause of great concern because of the applicability of limitations periods and the relative ease of determining the existence and extent of such claims." *Id.* § 38.05[5], at 38-16. Over time, however, the scope of corporate liability expanded, and the protection provided by statutes of limitation became less certain. *Id.* The legal domains where the risk of liability increased included environmental pollution, defective products, and other mass torts. *Id.*

In 1987, the Delaware General Assembly sought to address these risks by enacting Sections 280, 281, and 282 of the DGCL. Those sections established two paths: (i) a default path, in which directors determine a form and amount of security without judicial investment, and (ii) the Elective Path, under which a corporation could obtain a judicial determination up front regarding an amount of security that was reasonably likely to be sufficient for unknown claims. *See In re RegO Co.*, 623 A.2d 92, 104 (Del. Ch. 1992). The goal of the Elective Path is "to afford fair treatment to foreseeable future, yet unknown, claimants of a dissolved corporation," while at the same time providing protection for directors and stockholders. *Transamerica*, 2006 WL 587846, at \*7.

Section 280(c)(3) states that when a dissolved corporation follows the Elective Path, the corporation

13

shall petition the Court of Chancery to determine the amount and form of security which will be reasonably likely to be sufficient to provide compensation for claims that have not been made known to the corporation or that have not arisen but that, based on facts known to the corporation or successor entity, are likely to arise or to become known to the corporation or successor entity within 5 years after the date of dissolution or such longer period of time as the Court of Chancery may determine not to exceed 10 years after the date of dissolution.

8 *Del. C.* § 280(c)(3).

The Delaware courts have not previously interpreted the meaning of the "reasonably likely to be sufficient" standard in Section 280(c)(3), but the same language appears in Section 280(c)(1). That section requires that the Court of Chancery "determine the amount and form of security that will be reasonably likely to be sufficient to provide compensation for any claim against the corporation which is the subject of a pending action, suit or proceeding to which the corporation is a party . . . ." 8 *Del. C.* § 280(c)(1). The court has referred to the "reasonably likely to be sufficient" standard as the "Reasonableness Standard." *See In re Altaba, Inc.*, 264 A.3d 1138, 1162 (Del. Ch. 2021).

The plain meaning of the Reasonableness Standard starts with the concept of sufficiency. Black's Law Dictionary defines "sufficient" to mean "[a]dequate; of such quality, number, force, or value as is necessary for a given purpose." *Sufficient*, Black's Law Dictionary (11th ed. 2019). The Reasonableness Standard thus looks to whether the amount of security is adequate to provide compensation for the claimant.

Importantly, the Reasonableness Standard does not require an amount of security that "will be sufficient." *Cf.* 8 *Del. C.* § 280(c)(2). The Reasonableness Standard calls for an amount of security that is "reasonably likely to be sufficient," thereby qualifying the

14

concept of sufficiency with the adverbial phrase "reasonably likely." Something is "likely" to occur if it is more probable than not to occur. *See, e.g.*, *Likely*, Black's Law Dictionary (11th ed. 2019) ("[a]pparently true or real; probable" or "[s]howing a strong tendency; reasonably expected"). The Reasonableness Standard thus calls for an amount of security that generally will be sufficient across a range of possible outcomes.

The Reasonableness Standard takes the additional step of modifying the adverb "likely" with the adverb "reasonably." In this context, the additional adverb has two functions. First, it emphasizes the importance of judicial judgment. *See Altaba*, 264 A.3d at 1164–65. Second, the adverb makes clear that the court must make an objective determination, as in what "a reasonable person would believe," rather than deferring to the good faith judgment of the liquidating agent. *Id.* at 1164 n.19. "Due respect for the expertise and authority of corporate directors does not dictate deference to their judgment on the question of what constitutes adequate protections to various competing classes of claimants on dissolution." *RegO*, 623 A.2d at 109; *see Boesky v. CX P'rs, L.P.*, 1988 WL 42250, at *16 (Del. Ch. Apr. 28, 1988) ("[A] liquidating trustee's judgment as to what constitutes adequate security, even when made in good faith and advisedly is not entitled to the powerful effects of the business judgment rule; and that in such a setting, it is inescapably the function of the court that supervises the liquidation to make an independent judgment of the adequacy of such security when it is challenged.").

The difficulties in setting an amount of security for unknown claims are manifold. One obvious problem is that the claims are unknown. That makes it challenging to envision what types of claims might arise.

A second obvious problem is that the company seeking a judicial determination has little incentive to think hard about what types of claims might arise. This case provides an example. A petrochemical company did not provide any briefing or testimony on the issue of environmental risk.

A third and equally obvious problem is that even if the court can envision the types of claims that might arise, the court may err in setting the amount of security. One possibility is that the court may set the reserve too low. When a corporation has dissolved and entered the winding up process, stockholders are entitled to only "any remaining assets" after all creditor claims are satisfied. 8 *Del. C.* § 278. The corporation's statutory obligation to use its assets to satisfy creditors before distributing "any remaining assets" to stockholders codified the absolute priority rule, which holds that "to the extent of their debts creditors are entitled to priority over stockholders against all the property of an insolvent corporation." *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 116 (1939) (quoting *Kan. City Terminal Ry. Co. v. Cent. Union Tr. Co. of N.Y.*, 271 U.S. 445, 455 (1926)). If a reserve or other provision for payment does not prove sufficient for a creditor's claim, and if stockholders have received a liquidating distribution based on an amount of security that later proves inadequate, then those stockholders have jumped the line and received a distribution to which they were not entitled, contravening the rule of absolute priority. *Altaba*, 264 A.3d at 1155.

A less readily apparent problem is that the court may set the amount too high. If the court overestimates the amount of security required, then excess assets that could be used productively will be tied up unnecessarily in the winding up process. If the

16

corporation has excess assets in the winding up process, then creditors would not be harmed by distributions drawn from the excess. Society benefits from having those assets redeployed to other uses. *Id.*

When navigating between the twin risks of too much or too little security, the policies governing the winding up of a corporation warrant erring on the side of too much. While setting the amount of security too high risks delaying the productive use of assets, setting the amount too low risks foreclosing the possibility of legitimate claimants receiving compensation. That is particularly true for unknown claims, where the limits of human cognition and the incentive structure of a dissolution proceeding make it likely that some categories of claims will be missed.

Erring on the side of creditors also helps prevent the opportunistic use of the Elective Path. Directors owe duties to the corporation for the ultimate benefit of its stockholders as residual claimants. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 40–41 (Del. Ch. 2013). The pull of fiduciary obligation thus calls on directors to favor the common stockholders. *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *17–20 (Del. Ch. Apr. 14, 2017). And directors have a natural affinity for stockholders, because that is the constituency who elects them. *See* Stephen M. Banbridge, *The Profit Motive: Defending Shareholder Value Maximization* 73–74 (2023).

When a company faces significant future liabilities, such as mass tort claims, the corporation "might try to sell its operations in order to pay off current creditors, and then distribute any residuals to shareholders. In so doing, only the contract creditors and those tort creditors who already filed suit would have their claims satisfied." Kevin M. Warsh,

*Corporate Spinoffs and Mass Tort Liability*, 1995 Colum. Bus. L. Rev. 675, 692 (1995) (footnotes omitted). A spinoff can be used to further insulate assets from contingent tort claimants. *See id.* at 709–12; s*ee generally* John C. Heenan, *Graceful Maneuvering: Corporate Avoidance of Liability Through Bankruptcy and Corporate Law*, 65 Mont. L. Rev. 99 (2004). Through a bankruptcy liquidation or state court dissolution process, a corporation may seek leave to make liquidating distributions to equity holders that will limit the amount of assets available to future claimants. The fact that a court has approved the amount of the reserves, makes it nigh impossible for a future claimant to challenge the distribution. *Altaba*, 264 A.3d at 1159. The end result is that equity holders receive distributions and externalize risks on the future claimants and society.

The Company is the successor entity that emerged from a complex restructuring that has involved a bankruptcy reorganization, sales of assets, a spinoff, and the liquidation of the Company's assets. The parties who oversaw the process are sophisticated hedge funds who purchased distressed debt in the Company's predecessor for pennies on the dollar and converted their claims into equity. The Company has already distributed $430 million to its stockholders. When it dissolved, the Company had only $27 million in net assets, representing 6% of its pre-distribution asset value. Any future claimants only will be able to recover from whatever reserve the court sets. At a minimum, this fact scenario reinforces the need for the court to take care to ensure that future claimants are protected by the security contemplated by law.

## A.     The Company's Proposal

The Company has the burden of establishing the form and amount of security that will satisfy the statutory test. *Altaba*, 264 A.3d at 1144. The Company requests that the court approve a reserve of $10 million for any unknown claims that may arise or become known within five years from the date of its dissolution as required by Section 280(c)(3). At first blush, a final reserve of $10 million for unknown claims that may arise or become known over a period of five years seems like a big number. But it reflects only 2% the Company's asset value before it began making distributions to its equity holders, and the Company did not provide the court with a metric or methodology for determining whether the Company's proposal is reasonably likely to provide sufficient compensation for future claims that it might face stemming from environmental harm.

To the Company's credit, it erred on the side of caution during the winding up process. For example, the Company spent over $500,000 to mail notices to 78,657 potential creditors. Dkt. 1 ¶ 29. The Company received nearly 300 claim letters, with the Company evaluating and responding to each one. In the same vein, when Prosser requested that the Company reserve $700,000 more than the Company's proposal for its claim, the Company agreed to avoid a dispute and increased its proposed reserve by the requested amount. Dkt. 11 ¶ 4. Those steps inspire confidence.

The Company fell short, however, by never meaningfully addressing the potential for unknown claims. Most strikingly, the Company's filings did not mention the likelihood or potential cost of environmental claims. The court had to raise the subject with Rottino during the hearing.

19

In response to the court's questions, Rottino testified that he could not remember any significant environmental claims in the Company's history. Dkt. 15 at 41. He explained that most environmental risk comes from the drilling process and that the Company's focus on mature assets made environmental claims less likely. *Id.* at 40–43. He added that when the Company sold operating assets, the buyers assumed responsibility for any liabilities associated with those assets under the standard sale agreements that the Company used. *Id.* at 19, 40, 42. He also expressed his belief that any non-operating wells that the Company did not sell had been plugged and should not present a risk. *Id.* at 41–42.

That was helpful, but the court heard this information for the first time at trial. Moreover, Rottino admitted that he lacked significant knowledge in this area. For example, when the court asked about the Company's historical environmental liabilities, he answered that he was "not an expert on these things," but knew that the Company had not spent much capital on environmental claims. *Id.* at 43. Rottino could only provide anecdotal testimony that the Company had responded to a small number of requests to plug abandoned wells in Oklahoma. *Id.* at 41.

One need only perform some basic internet searches to find indications that no-longer producing wells may pose meaningful environmental risks.[1] Equally basic

---

[1] *E.g.*, Jeff Turrentine, *Millions of Leaky and Abandoned Oil and Gas Wells Are Threatening Lives and the Climate*, Nat. Res. Def. Council (July 26, 2021), https://www.nrdc.org/stories/millions-leaky-and-abandoned-oil-and-gas-wells-are-threatening-lives-and-climate; Nichola Groom, *Special Report: Millions of abandoned oil wells are leaking methane, a climate menace*, Reuters, June 26, 2020,

searches suggest that there may be methods of estimating the risk posed by no-longer producing wells.[2] These sources focus on wells that have not been permanently sealed. Rottino believed that the Company had plugged most of its wells, which could go a long way towards mitigating the risk of environmental claims.

The possibility of environmental claims is an obvious risk that the Company should have addressed proactively. It would have been particularly helpful to hear from a scientist or engineer who knows about the environmental problems that non-operating wells pose and who could have modeled the risks associated with the Company's operations. It also would have been helpful to hear from an accountant, actuary, or statistician who could discuss how to value contingent risks of that sort.

The Company has not yet carried its burden to support its proposed reserve for unknown claims.

---

https://www.reuters.com/article/us-usa-drilling-abandoned-specialreport/special-report-millions-of-abandoned-oil-wells-are-leaking-methane-a-climate-menace-idUSKBN23N1NL; Kyle Ferrar, *Idle Wells are a Major Risk*, FracTracker All. (Apr. 3, 2019), https://www.fractracker.org/2019/04/idle-wells-are-a-major-risk/; Nicholas Kusnetz, *Deteriorating Oil and Gas Wells Threaten Drinking Water Across the Country*, Sci. Am. (Apr. 4, 2011), https://www.scientificamerican.com/article/deteriorating-oil-gas-wells-threatening-americas-drinking-water/.

[2] *E.g.*, Daniel Rami et al., *Decommissioning Orphaned and Abandoned Oil and Gas Wells: New Estimates and Cost Drivers*, 55 Env. Sci. & Tech. 10224 (2021); Daniel Schiffner et al., *An updated look at petroleum well leaks, ineffective policies, and the social cost of methane in Canada's largest oil-producing province*, 164 Climactic Change 60 (2021); Patricia M.B. Saint-Vincent et al., *An Analysis of Abandoned Oil Well Characteristics Affecting Methane Emissions Estimates in the Cherokee Platform in Eastern Oklahoma*, 47 Geophysical Rsch. Letters, Nov. 23, 2020; Mary Kang et al., *Direct measurements of methane emissions from abandoned oil and gas wells in Pennsylvania*, 111 Proc. Nat'l Acad. Scis. 18173 (2014).

## B.      The Guardian Ad Litem

Section 280(c)(3) provides that "[t]he Court of Chancery may appoint a guardian ad litem in respect of any such proceeding brought under this subsection. The reasonable fees and expenses of such guardian, including all reasonable expert witness fees, shall be paid by the petitioner in such proceeding." 8 *Del. C.* § 280(c)(3). Delaware courts have not yet addressed the standard applied when appointing a guardian under Section 280(c)(3). In prior decisions, the discussion has been limited to observing that the statute grants the court the power to appoint a guardian.[3] Clearly, the issue is a matter for the court's discretion, but the precedents do not provide guidance beyond that. An examination of other related areas of law suggests that the court should exercise its discretion freely in favor of appointing a guardian.

The bulk of the Delaware cases involving guardians ad litem address the appointment of an individual to represent a person lacking legal capacity, such as a minor.[4] In that setting, the principal question is whether the individual lacks the capacity

---

[3] *See In re Altaba, Inc.*, 241 A.3d 768, 776 (Del. Ch. 2020) ("Section 280 contemplates that the court will ground its estimates on a full evidentiary record, with the benefit of expert analysis as needed and with the possibility of assistance from a guardian ad litem to represent unknown claimants."); *RegO*, 623 A.2d at 94 (noting that a guardian ad litem "pursuant to Section 280(c)(2), was appointed . . . in this proceeding to represent the interests of future unknown corporate claimants").

[4] *See, e.g.*, *In re David & Joan Traitel Fam. Tr.*, 2022 WL 2570793, at *2 (Del. Ch. July 8, 2022) (finding that "it was appropriate to appoint a guardian ad litem in this trust litigation" for individual trustee who was incapacitated); *Mennen v. Wilm. Tr. Co.*, 2013 WL 4083852, at *1 (Del. Ch. July 25, 2013) (noting that the court previously "appointed a guardian ad litem to represent the interests of A.M., the minor beneficiary"); *Price v. Wilm. Tr. Co.*, 730 A.2d 1236, 1238 (Del. Ch. 1997) (explaining that this court

to represent their own interests and requires representation. *See, e.g.*, *E.A. v. P.B.*, 2018 WL 4964335, at *8 (Del. Fam. May 29, 2018); *see also* Del. Lawyers' R. Prof'l Conduct 1.14(b) ("When the lawyer reasonably believes that the client . . . cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including . . . seeking the appointment of a guardian ad litem, conservator or guardian."). If so, then the court may appoint a guardian. That consideration always applies to unknown claimants, who by definition cannot represent themselves.

Another area of law that provides useful guidance concerns whether to appoint or permit a party to participate as an *amicus curiae*. The Delaware Supreme Court has explained that participation as an *amicus curiae* has historically been allowed "upon a demonstration that such assistance is advisable to protect the court in the consideration of the case, i.e., 'for the honor of a court of justice to avoid error.'" *Giammalvo v. Sunshine Mining Co.*, 644 A.2d 407, 408–09 (Del. 1994) (quoting *The Protector v. Geering*, 145 Eng. Rep. 394 (1686)). Appropriate roles for an *amicus curiae* include

> (1) assisting the court in a case of general public interest by providing adversarial presentations when neither side is represented; (2) assisting the court in a case of general public interest, by providing an adversarial presentation when only one point of view is represented; (3) assisting the court by supplementing the efforts of counsel, even when both sides are represented, in a case of general public interest; and (4) drawing the court's attention to broader legal or policy implications that might otherwise escape its consideration in the narrow context of a specific case.

---

appointed a guardian ad litem to represent an executrix who was "not in perfect health" and "suffered a stroke and was hospitalized for some time").

*Id.* at 409 (internal citations omitted). Generally speaking, a court may permit or appoint an *amicus curiae* where there is "need for additional assistance in cases involving questions of general public importance." *Id.* at 410.

With slight emendation, these considerations can inform the decision about appointing a guardian for unknown claimants. The amendment is the need for the case or issue to be "of general public importance." By specifically authorizing a guardian, Section 280(c)(3) makes clear that cases under the Elective Path warrant that type of assistance, regardless of whether the issue is of general public importance.

The otherwise flexible test for authorizing or appointing an *amicus curiae* indicates that a court should not hesitate to appoint a guardian if the court has questions about the reserve for unknown claimants. In a proceeding under the Elective Path, the dissolved corporation is typically the only party advocating for an amount and form of security, so the court is receiving a one-sided presentation. The guardian can supplement the efforts of counsel and draw the court's attention to broader legal or policy implications raised by the case. Overall, the guardian can assist the court and help to avoid error.

Section 280(c)(3) makes the appointment of a guardian discretionary, so a guardian need not be appointed in every case. There will be proceedings under the Elective Path where the dissolved corporation presents a thorough record that satisfies the court. When that has not happened, a court should exercise its discretion freely in favor of appointing a guardian.

24

In this case, the Company did not make any presentation on the risk of claims related to environmental pollution. The court elicited some information, but the record remains undeveloped. Although not necessary to the appointment of a guardian under the Elective Path, environmental pollution is a matter of general public importance, because when environmental pollution happens, its effects can be widespread and devastating.

The guardian will represent the interests of the unknown claimants. The guardian's tasks will be to (i) address the extent to which the Company's $10 million reserve is reasonably likely to provide sufficient security for unknown claims, and (ii) consider whether the claims period should be extended beyond the statutory default of five years.

The court does not expect the guardian to act in an adversarial capacity, but rather to supplement the efforts of counsel and draw the court's attention to broader legal or policy implications presented by the case. The court is not giving the guardian a blank check to explore these issues at any cost. The work will proceed in stages.

The initial step will be for the guardian to contact scientists who have expertise in the environmental issues presented by non-producing oil and gas wells. The guardian will seek to determine if there are reasonable and relatively cost-effective means of assessing the risks that non-producing oil and gas wells present. The guardian ad litem will not immediately take on the work of securing an assessment. The guardian's task will be to determine if it is possible and what it would entail.

A related task will be for the guardian to contact accountants, actuaries, or statisticians who have expertise in valuing the risk presented by environmental issues.

Here too, the guardian will seek to determine if there are reasonable and cost-effective methods of quantifying the risk and what doing so would entail.

A final task will be for the guardian to consider what other types of unknown claims the Company may face. The court has focused on environmental claims. The guardian will consider whether other types of unknown claims could be of concern.

The court believes that approximately four weeks should be sufficient for these tasks. At the end of that time period, the court will hold a status conference to hear from the guardian. If the guardian cannot identify sound methods of assessing these issues, then the court will take that answer into account. If the guardian determines that there are sound methods, then the court will want to know what those methods would involve. The guardian also will address any other types of unknown claims that could be of concern and identify methods of assessing the risk posed by those claims.

The Company will cooperate with the guardian's efforts. During or after the status conference, the court will rule on whether any further steps need to be taken and what those steps should entail.

### III.    CONCLUSION

The Company's request for a determination on the amount of security that is reasonably sufficient for unknown claims is held in abeyance. By separate order, the court will appoint a guardian to advise the court regarding these issues.

26